*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
THE COURT EN BANC[1]

———————————

**UNITED STATES**
*Appellee*

**v.**

**Dereck E. TABOR**
Staff Sergeant (E-6), U.S. Marine Corps
*Appellant*

**No. 202100046**

———————————

Argued: 24 March 2022—Decided: 25 May 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Jeffrey V. Munoz (arraignment and motions)
Stephen F. Keane (motions and trial)

Sentence adjudged 12 June 2020 by a general court-martial convened at Marine Corps Air Station Miramar, California, and Marine Corps Recruit Depot San Diego, California, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-1, confinement for seven years and six months,[2] forfeiture of all pay and allowances, and a dishonorable discharge.

———————————

[1] Judge HOUTZ took no part in the consideration or decision of this case.

[2] The convening authority suspended confinement in excess of 60 months pursuant to a pretrial agreement.

For Appellant:
*Elizabeth A. Harvey, Esq.* (argued)
*Major Mary C. Finnen, USMC* (on brief)
*Bethany L. Payton-O'Brien, Esq.* (on brief)

For Appellee:
*Lieutenant Catherine M. Crochetiere, JAGC, USN* (argued)
*Lieutenant Gregory A. Rustico* (on brief)

Judge DEERWESTER delivered the opinion of the Court, in which Chief Judge MONAHAN, Senior Judge STEPHENS, Senior Judge HOLIFIELD, Judge MYERS, and Judge HACKEL joined. Senior Judge STEPHENS filed a separate concurring opinion. Senior Judge GASTON filed a separate opinion concurring in part and dissenting in part, in which Judge STEWART joined.

———————————————

**PUBLISHED OPINION OF THE COURT**

———————————————

DEERWESTER, Judge:

Appellant was convicted, consistent with his pleas, of one specification of sexual abuse of a child, five specifications of indecent language, and one specification of indecent conduct, in violation of Articles 120b and 134, Uniform Code of Military Justice [UCMJ],[3] for communicating indecent language to Ms. Charles and encouraging her to masturbate while her ten-year-old daughter, Miss Bravo, was lying in bed next to her.[4]

Appellant asserts four assignments of error [AOEs]: (1) Appellant's plea to Specification 2 of Charge I was improvident where Miss Bravo was asleep during the alleged indecent conduct; (2) the military judge abused his discretion in denying Appellant's motion to recuse himself based upon the military judge's position as Regional Trial Counsel when the Naval Criminal Investigate Ser-

---

[3] Articles 120b & 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920b, 934 (2018) [UCMJ (2018)].

[4] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

vice [NCIS] consulted with one of his subordinate Senior Trial Counsel regarding Appellant's case; (3) Appellant's sentence to confinement was inappropriately severe given the disparity between his sentence to the sentence of 90 months' confinement that Ms. Charles received in a closely related case;[5] and (4) the Government's delay in post-trial processing of Appellant's case warrants relief.

We find Appellant's plea was provident and that it was unnecessary for Miss Bravo to be aware of the sex act Appellant directed Ms. Charles to commit in the child's presence. In so doing, we overturn our previously published decision in *United States v. Schmidt* [*Schmidt I*].[6] We now hold that indecent conduct "in the presence of a child" does not require that the child be aware of the indecent conduct committed in his or her presence for an accused to be guilty of sexual abuse of a child. We find no prejudicial error in the first, second, or third AOEs. However, due to the post-trial delay raised in the fourth AOE, we grant relief when we conduct our mandatory review of sentence appropriateness and take action concerning the sentence in our decretal paragraph. We affirm the findings and the reassessed sentence.

## I. BACKGROUND

While standing duty in his squadron's ready room, Appellant engaged in a sexually explicit text message conversation with Ms. Charles, a former high school classmate of his. During their exchange, Ms. Charles disclosed to Appellant that her ten-year-old daughter, Miss Bravo, was in the bed with her, and sent Appellant a photo of Miss Bravo, who was lying down, facing away from Ms. Charles. She told Appellant she intended to masturbate once her daughter fell asleep. Appellant responded that he was sexually aroused by the thought of Ms. Charles masturbating in the bed with her daughter and encouraged Ms. Charles to "do it anyway," even though Miss Bravo was not yet asleep.[7]

At approximately 12:30 a.m., Ms. Charles responded to Appellant that Miss Bravo's eyes were closed and then, approximately a minute later, she texted,

---

[5] Having reviewed this AOE, we find it to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

[6] *United States v. Schmidt*, 80 M.J. 586 (N-M. Ct. Crim. App. 2020) [*Schmidt I*], *aff'd*, 82 M.J. 68 (C.A.A.F. 2022) [*Schmidt II*].

[7] Pros. Ex. 5 at 7; R. at 429.

"Not sure if she's awake."[8] Appellant then responded and encouraged Ms. Charles to begin masturbating, writing, "Now play, baby."[9] Ms. Charles then sent Appellant several pictures of herself that depicted her undressed with her genitalia exposed. Miss Bravo was not in any of the photos, but at approximately 12:44 a.m., Ms. Charles texted, "She moved Daddy, breathing heavy."[10] About a minute later, Ms. Charles texted, "Yeah, she's asleep for sure."[11]

These facts came to light the next month when Miss Bravo's biological, non-custodial father became aware of the text message exchange and a criminal investigation ensued. After initially denying having been the victim of sexual abuse, Miss Bravo eventually came forward after her school gave a presentation on inappropriate touching. Miss Bravo disclosed to her guidance counselor, and then to law enforcement, that her mother and step-father (not Appellant) had touched her genitalia over the course of several years. Ms. Charles pleaded guilty to aggravated criminal sexual abuse of a family member in Illinois state court and was sentenced to 78 months' confinement.[12]

Appellant pleaded guilty at general court-martial to sexual abuse of a child, communicating indecent language, and indecent conduct. Specifically, for Specification 2 of Charge I, Appellant pleaded guilty to committing a "lewd act upon [Miss Bravo] . . . by intentionally counseling [Ms. Charles] to engage in indecent conduct, to wit: masturbation, intentionally done in the presence of [Miss Bravo], which conduct amounted to a form of immorality relating to sexual impurity which is grossly vulgar, obscene and repugnant to common propriety . . . ."

During Appellant's providence inquiry, the military judge questioned whether the acts were lewd if Miss Bravo was asleep when they occurred. The military judge reviewed relevant case law and consulted with trial counsel and trial defense counsel.[13] Ultimately, the military judge found that Appellant believed Miss Bravo was awake, and thus aware, for some period of Ms. Charles'

---

[8] Pros. Ex. 5 at 8.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] Pros. Ex. 11.

[13] Specifically, the military judge consulted this Court's opinion in *United States v. Lopez*, No. 201700252, 2019 CCA LEXIS 37 (N-M Ct. Crim. App. Jan. 31, 2019) (unpublished), and found that the facts of *Lopez* were generally analogous to Appellant's

lewd acts and that Appellant's plea of guilty was provident to the offense at issue.

## II. DISCUSSION

### A. Appellant's Plea Was Provident Because Miss Bravo's Awareness Was Not Required

Appellant argues that a substantial basis in law and fact exists to question his plea because Miss Bravo was not aware of the lewd acts as required under this Court's published opinion in *Schmidt I*. Specifically, Appellant contends that the record supports the conclusion that he believed that Miss Bravo was asleep, and thus unaware of the lewd conduct he encouraged Ms. Charles to commit. Therefore, in Appellant's view, it would be impossible for him to be guilty of sexual abuse of a child in violation of Article 120b, UCMJ, because the act could not have been done "in the presence of" a child who was unaware that the act even occurred.

We consider this case en banc to reevaluate our recent statutory interpretation in *Schmidt I*. We then turn to the question of whether the military judge abused his discretion in accepting Appellant's guilty plea.

#### 1. Standard of review and the law

We review whether a guilty plea is provident by determining if the record provides a substantial basis in law and in fact to question the guilty plea.[14] A guilty plea must be supported by a sufficient factual basis.[15] In determining whether a guilty plea is provident, the military judge may consider the facts contained in the stipulation of fact along with the inquiry of Appellant on the record.[16] However, before considering whether the plea was provident we must

---

case, noting that in *Lopez* the appellant's conviction for indecent exposure was upheld where the appellant entered a child's bedroom and exposed his genitalia to her. We note that the elements of an Article 120c, UCMJ (2018), charge of indecent exposure contemplate different statutory elements than the provision of the UCMJ at issue in the instant case. *See Schmidt I*, 80 M.J. at 579, n.8. But we credit the military judge for properly identifying that there was an issue regarding Appellant's plea, and note that this Court's opinion in *Schmidt I* had not yet been published.

[14] *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991).

[15] *United States v. Care*, 18 C.M.A. 535, 40 C.M.R. 247 (1969).

[16] *United States v. Whitaker*, 72 M.J. 292, 293 (C.A.A.F. 2013).

consider again whether the statute requires awareness by the child of the lewd act, as contemplated in *Schmidt I.*

Statutory construction and interpretation is a question of law we review de novo.[17] In statutory construction, we must first look to the statute and "give effect to the clear meaning of statutes as written."[18] Each word of a statute should be given its "ordinary, contemporary, and common meaning"[19] at the time the statute was enacted. When a statute's language "is unambiguous, the statute's plain language will control."[20] Whether a statute is ambiguous or not is determined, not by mere disagreement by the parties, but "by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole."[21]

Article 120b(c), UCMJ, provides that: "Any person subject to this chapter [10 USCS §§ 801 et seq.] who commits a lewd act upon a child is guilty of sexual abuse of a child and shall be punished as a court-martial may direct."[22] The definition of "lewd act" is expansive and includes, in relevant part to Appellant's case:

> any indecent conduct, *intentionally* done *with or in the presence of a child*, including via any communication technology, that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations.[23]

---

[17] *Schmidt I*, 80 M.J. at 595; *See also United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008) ("In summary, we review a military judge's decision to accept a guilty plea for an abuse of discretion and questions of law arising from the guilty plea de novo.").

[18] *United States v. Andrews*, 77 M.J. 393, 400 (C.A.A.F. 2018) (internal citation and quotation omitted).

[19] *Id.* (internal citation and quotation omitted).

[20] *United States v. Jacobsen*, 77 M.J. 81, 84 (C.A.A.F. 2017) (citing *United States v. Schell*, 72 M.J. 339, 343 (C.A.A.F. 2013)).

[21] *United States v. McPherson*, 73 M.J. 393, 395 (C.A.A.F. 2014) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

[22] Article 120b(c), UCMJ (2018).

[23] Article 120b(h)(5)(D), UCMJ (2018) (emphasis added).

*2. Background of "Indecent Liberties with a Child"*

As an initial matter, we think it instructive to review the statutory history and case law concerning indecent liberties with a child and how the concept of "awareness" of the child came to be considered an element.

### a. United States v. Brown

When the UCMJ first took effect in 1951, it criminalized sexual misbehavior with minors under Article 134, "indecent acts with a child under the age of 16 years."[24] Specifically, it criminalized "immoral, improper, or indecent liberties with, or the commission of any lewd or lascivious act upon or with the body of" a child.[25] Soon after, the Court of Military Appeals [CMA] weighed in on the statute in *United States v. Brown*,[26] a case where a soldier exposed himself from a car to a woman and two children, aged seven and ten, at Fort Benning. The issue was whether he was guilty of taking indecent liberties with a child because he had not physically assaulted or had any contact with the children when he exposed himself.

The CMA found the statute was drafted in the disjunctive and could be completed in two ways: "by (1) taking any immoral, improper, or indecent liberties with any child of either sex under the age of 16 years with the intent of gratifying sexual desires, or (2) by committing any lewd or lascivious act upon or with the body of any child with the same intent."[27] The statute set forth two different means of committing the offense, one which did not require any touching and the other in which "proof of contact [was] essential" to the offense.[28]

The CMA also found the statute was modelled after part of the District of Columbia [D.C.] Code.[29] The D.C. law was created in an attempt to clarify that the crime of indecent liberties with a child should be understood to capture conduct that comported with common law concepts of crimes against minors.[30]

---

[24] *Manual for Courts-Martial, United States* (1951 ed.) [*MCM* (1951)], ch. XXVIII, para. 213.d(3).

[25]*Id.*

[26] *United States v. Brown*, 3 C.M.A. 454, 13 C.M.R. 10 (1953).

[27] *Id*, 3 C.M.A. at 456, 13 C.M.R. at 12.

[28] *Id.*

[29] *Id.*

[30] *Id.*

In other words, the D.C. law clarified that while the offense of indecent liberties *with a child* requires an assault, indecent liberties *against a child* does not require physical contact.[31]

The CMA turned to the analysis of the D.C. law by the United States Court of Appeals for the District of Columbia.[32] The D.C. Circuit had considered a case where a taxi driver exposed his genitalia to a child passenger and requested that the child touch him.[33] The court considered that, historically, the common law did not require physical contact with a child in order for conduct to arise to criminal assault.[34] The court not only recognized the common law understanding concerning assault but added there was no requirement the child *understand* the nature of the act at all. From the D.C. Circuit's perspective, a view adopted by the CMA, it was not "necessary that such a victim should be aware of the nature of the act or of the danger."[35]

The CMA recognized that one purpose of the statute was to protect children from acts that cause "shame, embarrassment, and humiliation to children, or lead them further down the road to delinquency" in contrast to the appellant's argument that because he never touched the children he had not committed the offense of taking an indecent liberties.[36] But the CMA added:

> [t]aking indecent liberties is the first step toward more serious sex crimes of a perverted nature and it would be shocking to find out the President intended to class them with petty offenses. We therefore, believe that this offense is distinguishable from both the minor offenses of indecent exposure and assault, when the

---

[31] *Id.*

[32] *Id.,* 3 C.M.A. at 456–58, 13 C.M.R. at 12–14.

[33] *Beausoliel v. United States*, 107 F.2d 292 (D.C. Cir. 1939).

[34] *Brown*, 3 C.M.A. at 457–58, 13 C.M.R. at 13–14 (citing *Beausoliel*, 107 F.2d at 296) (reviewing past cases to conclude that any attempt to violate a minor need not require physical contact to meet the common law understanding of indecent liberties. "Hence, to stand in proximity to a young girl in a state of indecent exposure with intent to ravish has been held to be assault . . . it was held to be an assault to sit on the bed of a girl and lean over her with a proffer of sexual intercourse.").

[35] *Id.*, 3 C.M.A. at 457, 13 C.M.R. at 13 (quoting *Beausoliel*, 107 F.2d at 296).

[36] *Id.,* 3 C.M.A. at 461, 13 C.M.R. at 17.

act is performed with the specific intent to satisfy the sexual de-
sires of the participants.[37]

b. *United States v. Knowles*

In 1965, the CMA decided *United States v. Knowles*, where a soldier made
an obscene telephone call to a child.[38] The board of review modified the soldier's
guilty plea to taking indecent liberties with a child down to merely communi-
cating obscene language. The CMA affirmed this result pointing out that
*Brown* left "no doubt" that an act must be committed in the presence of the
child and not through a telephone. In drawing a distinction between uttering
obscene words to a child in the child's presence and just speaking them from a
remote location over a telephone, the CMA said, "The offense before us requires
greater conjunction of the several senses of the victim with those of the accused
than that of hearing a voice over a telephone wire." The CMA did leave open
the possibility for a different result in the event that indecent acts or obscene
language were performed "over an audio-visual system."[39]

c. *United States v. Miller* and Its Progeny

After *Brown* and *Knowles*, the UCMJ underwent an overhaul with the in-
troduction of the 1969 *Manual for Courts-Martial* [*MCM*]. Remaining under
Article 134, UCMJ, the crime of "indecent acts with a child" still criminalized
"indecent liberties with, or the commission of any lewd or lascivious act upon
or with the body of a child," however it now stated that indecent liberties "must
be taken in the physical presence of the child" but that "physical contact" was
"not essential."[40]

After yet another Congressional revision of the UCMJ, another *MCM* was
issued in 1984. Article 134 now included "indecent acts or liberties with a child"
and bisected the offense into "physical contact" and "no contact."[41] A physical

---

[37] *Id.* The CMA took pains to explain that even if the child's sexual desires were
gratified or that the child "consented" it would still amount to taking indecent liberties
with a child.

[38] *United States v. Knowles*, 15 C.M.A. 404, 35 C.M.R. 376 (1965).

[39] *Knowles*, 15 C.M.A. at 406, 35 C.M.R. at 378.

[40] Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1969) [UCMJ
(1969)].

[41] Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1984) [UCMJ
(1984)].

contact offense required an indecent act committed "upon or with the body" of a child.[42] A "no physical contact" offense required an indecent liberty "in the presence" of a child.[43] The explanation for this offense in the *MCM* stated that (1) indecent liberties must be taken in the "physical presence" of a child but did not require "physical contact"; (2) intentionally exposing private parts to a child was an indecent liberty; and (3) communicating indecent language was an indecent liberty "as long as the communication is made in the physical presence of a child."[44]

By 2005, Article 134's "indecent acts or liberties with a child" offense—still bisected into physical contact and without physical contact—required an indecent liberty without physical contact to be "committed in the presence of" a child. The explanations added by the President into the *MCM* concerning the offense continued to state that "indecent liberties . . . must be taken in the physical presence of the child" along with the other explanations listed above from the 1984 *MCM*.

In 2008, the Court of Appeals for the Armed Forces [CAAF] interpreted the offense of indecent liberties with a child as contained in the 2005 edition of the *MCM* in *United States v. Miller*.[45] Miller had been communicating online with an individual he believed was a 14-year-old girl, who was actually a law enforcement agent. Using a one-way video camera, he masturbated in front of his computer, believing the girl could view him on her monitor. He was convicted, among other things, of attempting to take indecent liberties with a child. The question before CAAF was whether the nature of Miller's presence was sufficient to meet the elements of the offense. The Government argued that Miller's "constructive presence" satisfied the presence requirement of the offense.[46] CAAF recognized that the Presidential explanations are "generally treated as persuasive authority."[47] CAAF drew on *Knowles* and considered its predecessor court's language that an obscene phone call lacked the "greater conjunction of

---

[42] Article 134, UCMJ (1984).

[43] Article 134, UCMJ (1984).

[44] *Manual for Courts-Martial, United States* (1984 ed.) [*MCM* (1984)], pt. IV, para. 89.c.

[45] *United States v. Miller*, 67 M.J. 87 (C.A.A.F. 2008).

[46] *Miller*, 67 M.J. at 90.

[47] *Id*. at 89.

the several senses of the victim" as compared with obscene language uttered in the physical presence of a child.[48]

CAAF then conducted an analysis of the offense's language and looked to the "definition and common understanding" of the word "presence" from the offense and "physical" from the Presidential explanation.[49] CAAF used two dictionaries to inform its analysis. CAAF drew its definition of the word "presence" from the 2004 edition of Black's Law Dictionary: "close physical proximity coupled with awareness."[50] CAAF defined the word "physical" using a lay dictionary, the 2003 edition of Merriam-Webster's Collegiate Dictionary, which defined the word as "having material existence" and "relating to the body."[51] In rejecting the Government's argument that "constructive presence" through a one-way web camera satisfied the statutory and explanatory definition of "physical presence" CAAF concluded, "[t]hese definitions taken together compel the conclusion that 'physical presence' requires that an accused be in the same physical space as the victim."[52]

Congress responded by amending the statute to include a *Miller*-type fact pattern to address conduct done remotely. In the wake of *Miller*, several Service Courts of Criminal Appeals opinions addressing the offense of indecent liberties with a child all focused on the word "awareness," drawing upon CAAF's use of Black's Law Dictionary to define "presence." Examples of these cases include *United States v. Burkhart*,[53] a published case in 2013 from the Air Force Court of Criminal Appeals; *United States v. Anderson*,[54] an unpublished case from this Court just a few weeks after *Burkhart*; and *United*

---

[48] *Id.*

[49] *Id.* at 90.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *United States v. Burkhart*, 72 M.J. 590 (A.F. Ct. Crim. App. 2013).

[54] *United States v. Anderson*, No. 201200499, 2013 CCA LEXIS 517 (N-M. Ct. Crim. App. June 27, 2013) (unpublished).

*States v. Gould*,[55] a very brief unpublished opinion by the Army Court of Criminal Appeals from 2014. Each of these cases cited the "awareness" sentence from *Miller*.

As discussed above, in response to *Miller*, Congress changed the indecent liberties with a child statute. Complicating matters, Congress also enacted major changes to Article 120, UCMJ, the rape and sexual assault statute, in 2007 and in 2012. What had previously been Article 134, "Indecent acts or liberties with a child" became Article 120b, "Rape and sexual abuse of a child." The present statute now incorporates the sexual abuse of a child by a lewd act performed in the presence of a child via any communication technology. The maximum punishment for a case not involving sexual contact includes a dishonorable discharge and confinement for 15 years.

"Indecent conduct" is currently punished under Article 134, UCMJ. Indecent is defined as, a "form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations."[56] This is the identical language of the central element for sexual abuse of a child under Article 120b(c). The explanation for indecent conduct warns that "for child offenses, some indecent conduct may be included in the definition of lewd act and preempted by Article 120b(c)."[57] The maximum punishment includes confinement for five years and a dishonorable discharge. The statute has no enhanced punishment for children and does not appear intended to specifically protect children.

### d. *United States v. Schmidt*

In 2020, this Court issued our published opinion in *Schmidt I*, holding that a child victim must be aware of any lewd act done in his presence for the act to be considered sexual abuse of a child under Article 120b(c), UCMJ. *Schmidt* was a contested case where the appellant masturbated in the presence of a fifteen-year-old boy. The boy was aware of the appellant's presence, but pretended to be asleep when the appellant was masturbating near him and touching him. It was clear that the appellant's sexual focus was the boy. During trial,

---

[55] *United States v. Gould*, No. ARMY 20120727, 2014 CCA LEXIS 694 (Army Ct. Crim. App. Sep. 16, 2014) (unpublished), *rev'd in part on other grounds*, 75 M.J. 22 (2015).

[56] Article 134, UCMJ (2018).

[57] *Manual for Courts-Martial, United States* (2019 ed.) [*MCM* (2019)], pt. IV, para. 104.c.(2).

the military judge provided findings instructions to the members on the elements of the crime of sexual abuse of a child under Article 120b(c), UCMJ.

Although he instructed on such elements as the "lewd act," the victim's age, the victim's presence, and the vulgar and immoral nature of the conduct, he did not instruct on *awareness*. In response to members' questions about the meaning of the phrase "in the presence of," the military judge instructed them to use their own ordinary understanding of the words. The appellant waived any objection to this, but did argue in closing that the appellant himself was unaware that the child was aware of appellant's masturbation. We affirmed the appellant's conviction for sexual abuse of a child because the record showed that the appellant knew that the child was only feigning sleep and that he knew the child was aware of his conduct.

CAAF granted the appellant's petition for review in *Schmidt II* and affirmed. But it did so in a fractured judgment which did not constitute a binding opinion of the court. As such, CAAF did not settle the issue of whether the child victim must be aware of the lewd act to convict under Article 120b(c), UCMJ.

Judge Sparks, delivering the judgment of the court, found an awareness requirement in the statute. He did so largely due to the Congressional amendment of the statute in response to *Miller*, where Congress added "via any communication technology," and omitted the word "physical" before the word "presence."[58] Judge Sparks reasoned that Congress intended for a victim to have some sensory connection with the conduct, whether it was in the physical presence or through some communication technology.[59]

Chief Judge Ohlson, joined by Senior Judge Erdmann, came to the opposite conclusion. Their opinion found that using the plain ordinary meaning of the word "presence" did not necessarily include the concept of awareness. They criticized the use of Black's Law Dictionary—as used in *Miller* and all of its progeny, including *Schmidt II*—to define "presence" because it was a technical legal dictionary, and the definition of "presence" that required "awareness" was the secondary, more technical definition offered by that publication. They believed that a correct statutory interpretation should rely on lay dictionaries and the plain, ordinary meaning of the word "presence."[60]

---

[58] *Schmidt II*, 82 M.J. at 74.

[59] *Id.*

[60] *Id.* at 77–78.

13

Judge Maggs, joined by Judge Hardy, found waiver by the appellant on the military judge's instruction concerning the meaning of "presence." Thus, Judge Maggs' opinion did not address whether "presence" requires awareness by the child victim with regard to this offense.[61]

*3. The Phrase "in the Presence of" Does Not Require that the Child Victim be Aware of the Lewd Act*

Words and phrases in the UCMJ are interpreted by examining "the ordinary meaning of the language, the context in which the language is used, and the broader statutory context."[62] When that examination results in a uniform, clear, and unambiguous interpretation, we simply use the plain meaning and apply the terms as written.[63] Where the plain meaning of a statutory phrase cannot be so easily divined, we may turn to additional canons of statutory interpretation, including: "the contemporaneous history of the statute; the contemporaneous interpretation of the statute; and subsequent legislative action or inaction regarding the statute."[64]

Though the statute does not define the word, "upon," for those lewd acts consisting of indecent conduct, the phrase "upon a child" is subsumed within the statute's further definition of indecent conduct done "with or in the presence of a child."[65] Thus the conduct prohibited by Article 120b(c) can be completed by performing a lewd act "with" or "in the presence of" a child. In *Schmidt I*, we focused on the latter and determined that the phrase "is susceptible to more than one interpretation."[66] Accordingly, we then turned to the history of the statute coupled with an analysis of relevant case law.

Ultimately, we concluded that for a child to be "in the presence of" an indecent act, it is required that the victim be aware that the act is taking place.[67] The backbone of our conclusion was that such an interpretation was consistent with what seemed to be the longstanding principle that the purpose of Article

---

[61] *Id*. at 80–81.

[62] *United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016).

[63] *United States v. Kohlbek*, 78 M.J. 326, 331 (C.A.A.F. 2019).

[64] *Schmidt I*, 80 M.J. at 595 (quoting *United States v. Tardif*, 57 M.J. 219, 226 (C.A.A.F. 2002) (Crawford, C.J., dissenting)) (internal quotation omitted).

[65] *See Schmidt I*, 80 M.J. at 595.

[66] *Id*. at 596.

[67] *Id*. at 598.

120b(c), UCMJ, like other statutes criminalizing indecent conduct involving children, was to protect the child from those acts which had a "tendency to corrupt their morals . . . which can occur by the conduct merely being done in their presence."[68] Further analysis of the legislative action and relevant case law concerning the predecessor offense is required to determine whether our earlier conclusion in *Schmidt I* can withstand additional scrutiny. We conclude that it cannot.

In *Schmidt I*, we reasoned that the operative language at issue, "in the presence of," was developed in the context of the predecessor Article 134 offense and began our historical analysis with the 1954 case interpreting that statute, *United States v. Brown*[69], as we have done here. However, in *Schmidt I*, unlike here, our analysis of *Brown* was brief:

> The court determined that the "purpose of this type of legislation is to protect children under a certain age from those acts which have a tendency to corrupt their morals," and the statutory language was "broad enough to cover specifically those offensive situations in which an assault or battery is missing but the immoral and indecent liberties are so offensive that the minor is harmed." The court reasoned that "the injury to the child and the consequential damage to society from the performance of the depraved act in [*the child's*] *presence* are just as great as when there is an actual physical contact between the performer and the child."[70]

At the end of our analysis, we concluded that *Brown* stood for the proposition that certain conduct in the presence of a child could amount to an indecent liberty criminalized by the statute "due to the connection between the conduct and the harm it causes to the child."[71] Now, upon further review, we find that understanding to be incomplete.

We are satisfied that the CMA in *Brown* likewise adopted the view that the victim need not completely comprehend the nature of the act for the act itself to be captured by the Article 134, UCMJ predecessor offense. As a preliminary

---

[68] *Id.* (cleaned up).

[69] *Id.* at 596 (analyzing *Brown*).

[70] *Schmidt I*, 80 M.J. at 596 (quoting *Brown*, 3 C.M.A. at 457–58, 13 C.M.R. at 13–14) (emphasis in original).

[71] *Id.*

matter, the CMA plainly recognized the debt that the Article 134 predecessor offense had to the D.C. law and the relevant explanatory case law. The CMA also clearly understood the indecent liberties with children statute was promulgated with the common law understanding that physical contact was not required. But it also recognized that the victim need not "be aware of the nature of the act."[72] We overlooked this fact in *Schmidt I*, where we stated:

> the "purpose of this type of legislation is to protect children under a certain age from those acts which have a tendency to corrupt their morals," and the statutory language was "broad enough to cover specifically those offensive situations in which an assault or battery is missing but the immoral and indecent liberties are so offensive that the minor is harmed."[73]

Our earlier look at *Brown* left out a critical observation made by the CMA. Not only did the CMA expressly consider the earlier judicial treatment of the D.C. law upon which the indecent liberties was based, but the CMA again addressed the concept of awareness in their own analysis—a passage omitted from our analysis of that case in our original review in *Schmidt I*. The full excerpt from *Brown* reads:

> The evidence purpose of this type of legislation is to protect children under a certain age from those acts which have a *tendency* to corrupt their morals, and if the many variations in which it is possible to take indecent liberties with a child are restricted to those founded on an assault or battery, then many debasing acts which are detrimental to the morals of a minor are not proscribed. Certainly, the injury to the child and the consequential damage to society from the performance of a depraved act in his presence are just as great as when there is an actual physical contact between the performer and the child. It may be that by extending assault to include any immoral or indecent act which might *tend* to cause minors to be embarrassed, humiliated, or ashamed, a finding of taking indecent liberties could be sustained on an assault theory but the extension is unnecessary as the provision presented under arm (a) [of Article 134, UCMJ] would cover that area. In addition, there are cases wherein an accused exhibits himself or suggests that a minor do so, which *do not cause some minors mental disturbance regardless of the*

---

[72] *Brown*, 3 C.M.A. at 457, 13 C.M.R. at 13 (quoting *Beausoliel*, 107 F.2d at 296).

[73] *Schmidt I*, 80 M.J. at 596 (quoting *Brown*, 3 C.M.A. at 457–58, 13 C.M.R. at 13–14).

*depravity of the exhibition*, and so there is a necessity for proscribing acts which are degrading to minors even though an assault in the usually accepted sense has not actually been committed. That is why we believe the recent trend of legislation has been toward affording the minor *more protection* and why we further believe the District of Columbia Code and the Manual provisions are *sweeping* and set out the elements in the alternative. This eliminates any uncertainty, as the language used is broad enough to cover specifically those offensive situations in which an assault or battery is missing but the immoral and indecent liberties are so offensive that the minor is harmed. [74]

Reviewing the CMA's analysis, it is plain to see that the offense of indecent liberties codified by the Article 134 predecessor offense, contemplated criminalizing conduct that neither involved physical assault nor required a minor to even "be aware of the nature of the conduct" or experience "mental disturbance" as a result of the conduct.[75]

It is axiomatic that we may resort to case law to resolve any ambiguity, so long as we are cautious that "case law must comport with [the statute] and not vice versa."[76] After further consideration of our prior reading of *Brown*, we now conclude that *Brown*, rather than *only* focusing on an "indecent liberty due to the connection between the conduct and the harm it causes to the child,"[77] more accurately states that certain conduct done in the presence of a child could amount to an indecent liberty due to the *tendency* that such acts have to cause harm to children.

This conclusion is directly supported by *Brown* itself. While it is true that the CMA stated that the statutory language was "broad enough to cover specifically those offensive situations in which an assault or battery is missing but the immoral and indecent liberties are so offensive that the minor *is harmed*," that statement refers to the specific factual underpinnings at issue in *Brown*.[78] Recall that in *Brown*, the question before the CMA was whether the appellant could have been convicted under Article 134, UCMJ, for exposing his genitals while driving by children who were riding bicycles. Indeed, the Court deter-

---

[74] *Brown*, 3 C.M.A. at 457–58, 13 C.M.R. at 13–14 (emphasis added).

[75] *Beausoliel*, 107 F.2d at 296; *Brown*, 3 C.M.A. at 457–58, 13 C.M.R. at 13–14.

[76] *United States v. Warner*, 62 M.J. 114, 120 n.30 (CA.A.F. 2005).

[77] *Schmidt I*, 80 M.J. at 596.

[78] *Brown*, 3 C.M.A. at 457–58, 13 C.M.R. at 13–14 (emphasis added).

mined that the specific harmful act fell within the scope of the statute. However, the *Brown* court did not read into the law a general requirement that the government demonstrate that a minor actually be aware of the conduct in every prosecution under the statute.

We are thus unpersuaded that *Brown* stands for the proposition that certain conduct done in the presence of a child amounts to indecent liberties because some cognizable harm results from the conduct. Instead, we read *Brown* to criminalize those offenses which would have a *tendency* to harm children, regardless of whether the actual victim formed an understanding or appreciation of the act at hand. Therefore, *Brown* does not cause us to read into the current statute, Article 120b(c), UCMJ, a requirement that the victim need have an awareness of the act for the act to have been done "in the presence of" the victim.

Similarly, we also do not understand CMA's holding in *Knowles* to read such a requirement into the statute. As a preliminary matter, it is clear from that opinion the thrust of the analysis in *Knowles* pertains to the physical location of the accused relative to the victim. There is nothing in *Knowles* that would suggest that the Court strayed from the question before them to opine on the level of sensory awareness a victim must have to be the victim of an indecent liberty. Moreover, we are reluctant to assume that the Court would so deviate and would read a new element into the statute via a three-page opinion. CMA's holding that "greater conjunction of the several senses of the victim with those of the accused" than that relationship present over the telephone, merely speaks to the notion that an accused's telephonic presence was not, at the time, proscribed by the statute. We conclude that the Court's analysis was singularly focused on the accused's physical presence with relation to the victim, rather than with the victim's sensory awareness of the accused. First, we find the plain language of the *Knowles* opinion clear on this point. Second, CMA did not rely on any of the analysis from *Brown* which dealt with the understanding, awareness, or even harm suffered by the victim. Finally, after delivering its holding, the Court commented that it was open to consideration in the future of whether the addition of video to the audio would cause conduct to be properly captured by the statute.[79] In so doing, the Court did not provide any indication that the additional "conjunction of the several senses"

---

[79] *Knowles*, 15 C.M.A. at 406, 35 C.M.R. at 378. ("We leave for such time as it may be directly before us consideration of whether the offense is committed by performance of indecent acts and the use of obscene language over an audio-visual system.").

provided by video may waiver and vacillate depending upon the intended target's awareness or understanding of the conduct.[80] Therefore, we cannot read from *Knowles* that the predecessor offense required any additional level of awareness on the part of the child victim.

Turning to CAAF's analysis in *Miller*, we find it salient that the Court was not considering the question of whether a victim's awareness of the indecent act or an understanding of the act was required. Indeed, here, as with *Knowles*, the focus of the Court's inquiry was whether the appellant could satisfy the physical presence requirement of the predecessor statute via the use of electronic means. To that end, the government in *Miller* argued that the appellant's use of the webcam tended to bring about the required physical presence.[81] CAAF rejected this argument. First, the Court noted that the Manual was revised in response to *Knowles* and now stated in the explanation section that "the liberties must be taken in the physical presence of the child, but physical contact is not required."[82] Relying on these changes to the Manual, the court held that "for the offense of taking indecent liberties with a child, presence means physical presence, rather than presence created through the use of "an audio-visual system."[83, 84]

The statutory definition of "physical presence," CAAF explained, did not allow for a "constructive presence" created by technology to satisfy the physical presence requirement. The Court stated that "the definition and common understanding of 'presence' is: '[t]he state or fact of being in a particular place and time' and '[c]lose physical proximity coupled with awareness.' [citing to *Black's Law Dictionary* 1221 (8th ed. 2004)] The modifying word 'physical' is commonly defined and understood as 'having material existence' and 'of or relating to the body.' [citing to *Merriam-Webster's Collegiate Dictionary* 935 (11th

---

[80] *Id.,* 15 CMA at 405–06, 35 C.M.R. at 377–78.

[81] *Miller*, 67 M.J. at 90.

[82] *Miller*, 67 M.J. at 89; *MCM* pt. IV, para. 87.c.(2) (2005).

[83] *Miller*, 67 M.J. at 90.

[84] We pause here to note that the definitional language under which Appellant was convicted is the same as the language used in the former indecent liberties offenses, except that in the current statute, Article 120b(c), Congress "filled the gap created by *Knowles* and *Miller* by more broadly defining 'in the presence of a child' as 'including via any communication technology.'" *Schmidt I*, 80 M.J. at 597 (quoting Article 120b(h)(5)(D), UCMJ).

ed. 2003)].[85] As discussed below, as well as at length in our *Schmidt I* analysis, the service courts adopted *Miller*'s use of "close proximity coupled with awareness" and found that "in order to sustain a conviction for indecent liberties with a child, the child had to be aware of the conduct."[86] We find this result rather curious.

First, in *Miller*, CAAF did not hold that the definitions require an awareness on the part of the victim for an act to be done "in the presence of" a child. Rather, the Court found that the above definitions "taken together compel the conclusion that 'physical presence' requires that an accused be in the same physical space as the victim."[87] It seems to be an incongruous result that the service courts would take *Miller* to require a child victim to be aware of an act in order to satisfy the "presence" requirement when CAAF not only did not do so, but affirmatively stated the definitions only require that the accused and victim share the same *physical*, vice *virtual*, space.[88] Second, the "ordinary meaning of the language" is used to interpret words and phrases in the UCMJ.[89] Using a legal dictionary such as *Black's Law Dictionary* to find meaning in a word with an "easily graspable definition outside of a legal context" is problematic.[90] Such an interpretation would require servicemembers to under-

---

[85] *Miller*, 67 M.J. at 90.

[86] *Schmidt I*, 80 M.J. at 596. *See United States v. Burkhart*, 72 M.J. 590 (A.F. Ct. Crim. App. 2013); *United States v. Anderson*, No. 201200499, 2013 CCA LEXIS 517 (N-M. Ct. Crim. App. June 27, 2013) (unpublished); *United States v. Gould*, No. 20120727, 2014 CCA LEXIS 694 at *2 (A. Ct. Crim. App. Sep. 16, 2014) (unpublished), *rev'd in part on other grounds*, 75 M.J. 22 (2015).

[87] *Miller*, 67 M.J. at 90.

[88] *See Schmidt II*, 82 M.J. at 77 (CJ. Ohlson, concurring in the judgment) (noting that "the most that can be said about the *Miller* case is that the Court cited the second definition from Black's Law Dictionary, not that it relied upon that second definition or that the second definition played a central role in the disposition of the case. In fact, the *Miller* Court held that 'physical presence' merely 'requires that an accused be in the same physical space as the victim.' Therefore, Miller actually serves to undermine [a]ppellant's position.") (internal citation omitted).

[89] *United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016).

[90] *See Schmidt II*, 82 M.J. at 75 (Ohlson, C.J. concurring in the judgment). *See also Wooden v. United States*, ___ U.S. ___, 142 S. Ct. 1063 (2022). The separate opinion authored by Senior Judge Gaston disagrees with this proposition. The separate opinion points to a recent decision from the Supreme Court of Florida to support its ultimate conclusion as well as its reliance on one technical definition of "presence" from *Black's*

stand what is expected of them not through a plain interpretation of the statutes written by Congress, but through the use of a legal interpretive tool.[91] Third, it is our view that such a conclusion would directly contradict the holding of the CMA in *Brown* that an indecent liberty does not require a minor to "be aware of the nature of the conduct" or experience "mental disturbance" as a result of the conduct.[92]

Returning to our prior decision in *Schmidt I*, we must conclude, in light of the foregoing analysis, that our holding in that case was wrong. We can no longer say that "the offense of sexual abuse of a child by indecent conduct—like its predecessor, indecent liberties with a child—requires that in order for the accused's conduct to be done 'in the presence of' a child, the child must be aware of it."[93] Indeed, this understanding would conflict with our superior court's holding in *Brown* that the indecent liberties offense, the precursor for the sexual abuse of a child statute in the instant case, does not require that a child have an understanding or awareness of an act in order for it to be completed in their presence.[94] Instead, we find that the plain definition of "presence" should be used to interpret the statute.

---

*Law Dictionary*. *See* discussion *infra United States v. Tabor*, ___ M.J. ___, No. 202100046, slip op. at 60 (N-M Ct. Crim. App. May 25, 2022), https://www.jag.navy.mil/courts/documents/archive/2022/TABOR_202100046_EN-BANC_PUB-Concur-Dissent.pdf (Gaston, S.J., concurring in part, dissenting in part, and concurring the judgment) (citing *State v. Werner*, 609 So. 2d 585, 587 (Fla. 1992) (relying in part on *Black's Law Dictionary* for the court's holding that a child "must see or sense that a lewd or lascivious act is taking place for a violation [of a similar Florida statute] to occur.")) However, this holding of the Supreme Court of Florida has not been immune from scrutiny and criticism from other jurisdictions. *See Clemens v. State*, 318 Ga. App. 16, 20 n.10, 733 S.E.2d 67, 71 (2012) (rejecting *Werner* as unpersuasive); *State v. Bryan*, 102 P.3d 496, 500–01 (Kan. Sup. Ct. 2004) (rejecting the Supreme Court of Florida's framework based on the "common understanding" of the statutory language).

[91] We note as well, as Chief Judge Ohlson does in his concurrence in *Schmidt II*, that even other legal dictionaries do not define the word "presence" to require awareness. *See Schmidt II*, 82 M.J. at 75 n.3 (Ohlson, C.J. concurring in the judgment).

[92] *Beausoliel*, 107 F.2d at 296; *Brown*, 3 C.M.A. at 457–58, 13 C.M.A. at 13–14.

[93] *Schmidt I*, 80 M.J. at 598.

[94] *Beausoliel*, 107 F.2d at 296; *Brown*, 3 C.M.A. at 457–58, 13 C.M.A. at 13–14.

### *4. The Plain Definition of Presence is Most Appropriate*

The plain language of the statute requires an accused who is intentionally engaged in a lewd act to be aware of the child's presence. There is no requirement, either explicitly or implicitly in the statute, that the child victim be aware of the accused's lewd act. There is no question here whether masturbating can constitute indecent conduct. Thus the focus of our inquiry is whether masturbating "intentionally . . . in the presence of a child" requires that child be aware of the masturbation in order for that act to be criminalized by Article 120b(c), UCMJ.[95]

Like the opinion authored by Chief Judge Ohlson in *Schmidt II*, we too begin with an in-depth examination of the definition at issue. Before considering the definition of the word "presence" we would look at the term "upon," first used in the 1951 predecessor Article 134, offense. The 1951 offense proscribed "lewd acts" done "upon or with the body of" a child. We know from *Brown* that "with" is understood to mean a lewd or lascivious act that was a touching and "upon" would be similar conduct that did not involve a touching.

The first time the word "presence" is used in the statute is in the 1969 edition of the Manual. The definition for "presence" in *Black's Law Dictionary* reads as follows:

> 1. The quality, state, or condition of being in a particular time and place, particularly with reference to some act that was done then and there <his presence at the scene saved two lives>. 2. Close physical proximity coupled with awareness <the agent was in the presence of the principal>.[96]

Appellant points to the second definition for this word, as we did in *Schmidt I* and as the service courts have done in reliance on *Miller*, for the proposition that if a child is asleep or otherwise oblivious to the conduct, then the conduct is not done in the presence of the child.[97] Applied to the specific facts of his case, Appellant argues that the evidence demonstrates that Miss Bravo was asleep before Ms. Charles began the lewd act and, therefore, was unaware that the lewd act was occurring. Stated differently, Appellant asserts that if Miss Bravo is not aware of her mother masturbating beside her, then it is impossible

---

[95] *Id.*

[96] *Presence, Black's Law Dictionary* (11th ed. 2019). *See Schmidt II*, 82 M.J. at 75 (CJ. Ohlson, concurring in the judgment).

[97] Appellant's Br. at 11–12.

for that masturbation to have been done in her presence. Since completion of a lewd act in the presence of a child is a required element of the statute, he argues, there exists substantial basis in law and fact to question his plea.[98]

We disagree. As pointed out by Chief Judge Ohlson's concurrence in *Schmidt II*, "[a]lthough *Black's Law Dictionary* may be the preeminent source for definitions of legal terms and phrases, when a word has an easily graspable definition outside of a legal context, authoritative lay dictionaries may also be consulted."[99] We think, too, that the undertaking of statutory interpretation, which strives to derive plain and ordinary meaning from criminal statutes, is most appropriately approached by using the lay, nontechnical, definitions of words and phrases *first*.[100] Indeed, "a number of authoritative lay dictionaries do not require awareness in order for one person to be in the presence of another person[,]" nor do other legal dictionaries.[101]

The primary definition of "presence" is the "quality, state, or condition of being in a particular time and place, particularly with reference to some act

---

[98] *Id*. at 14.

[99] *Schmidt II*, 82 M.J. at 75 (CJ. Ohlson, concurring in the judgment) (citing *Brackett v. Focus Hope, Inc.*, 482 Mich. 269, 753 N.W.2d 207, 211 (Mich. 2008) ("A lay dictionary may be consulted to define a common word or phrase that lacks a unique legal meaning."))

[100] *See United States v. Daniels*, 7 M.J. 560, 562 (N-M Ct. Crim. App. 2002) ("[I]n interpreting a Manual provision, this Court gives the terms used their natural, plain, and ordinary meaning.") (citing *United States v. Ray*, 51 M.J. 511, 517 (N-M. Ct. Crim. App. 1999).

[101] *Schmidt II*, 82 M.J. at 75–76 (CJ. Ohlson, concurring in the judgment) (citing Merriam-Webster's Unabridged Online Dictionary, https://unabridged.merriam-webster.com/unabridged/presence (last visited Jan. 27, 2022) (defining "presence," in relevant part, as "the state of being in one place and not elsewhere[,] the condition of being within sight or call, at hand, or in a place being thought of[, or] the state of being in front of or in the same place as someone or something"); The American Heritage Dictionary of the English Language 1393 (5th ed. 2018) (defining "presence," as "[t]he state or fact of being present" and "present," in relevant part, as "'[b]eing at hand or in attendance"); Merriam-Webster's Collegiate Dictionary 982 (11th ed. 2020) (defining "presence," in relevant part, as "the part of space within one's immediate vicinity")); *See also Schmidt II*, 82 M.J. at 75 n.3 (citing to several legal dictionaries which do not define presence as requiring awareness).

that was done then and there . . . ."[102] The secondary definition defines "presence" as "close physical proximity coupled with awareness . . . ."[103] Appellant, as well as our prior holding in *Schmidt I*, fail to explain why the second definition for "presence" in *Black's Law Dictionary* should be used instead of the primary definition. "In making a choice between two competing definitions, if only one of the definitions gives effect to the clear statutory purpose, then that definition must be the one intended by Congress."[104] Prior reliance by us and our sister service courts on the secondary definition is misplaced.

"The prefatory material in *Black's Law Dictionary* explains that information contained within angle brackets provides '[c]*ontextual* illustration of a headword.'"[105] "We interpret words and phrases used in the UCMJ by examining the ordinary meaning of the language, *the context in which the language is used*, and the broader statutory context."[106] In *Black*'s secondary definition of presence, the angle brackets inform the reader that the awareness requirement arises in the context of the bracketed example: "the agent was in the presence of the principal."[107] To us, this additional context makes crystal clear that the secondary definition speaks exclusively to the type of presence required for certain legally significant events, "such as the binding of the principle or attestation of a will."[108]

Context is key. Defining "presence" as "proximity, coupled with awareness" makes sense when viewed through the lens of traditional canons and principles of agency and attestation.[109] In the context of the instant case, indecent acts

---

[102] *Presence*, *Black's Law Dictionary* (11th ed. 2019).

[103] *Id.*

[104] *Schmidt II*, 82 M.J. at 76 (CJ. Ohlson, concurring in the judgment) (citing *Albernaz v. United States*, 450 U.S. 333, 342 (1981) ("[w]here Congress has manifested its intention, we may not manufacture ambiguity in order to defeat that intent.")).

[105] *Id.* at 77. (quoting *Black's Law Dictionary* xxix (11th ed. 2019) (emphasis in original).

[106] *Schmidt II*, 82 M.J. at 76 (CJ. Ohlson, concurring in the judgment) (citing *Pease*, 75 M.J. at 184).

[107] *Presence*, *Black's Law Dictionary* (11th ed. 2019).

[108] *Schmidt II*, 82 M.J. at 76 (CJ. Ohlson, concurring in the judgment) (citing *Pease*, 75 M.J. at 184).

[109] *Id.* (citing *N. Owsley & Sons v. Woolhopter*, 14 Ga. 124, 128 (1853) ("[I]f one, in the presence of the principal, sell[s] a parcel of goods of the latter, as his agent, without objection, the tacit consent of the principal will be presumed; and it will bind him."); *Meyer v. Fanning (In re Estate of Meyer)*, 2016 WY 6, 367 P.3d 629 ("[T]he will must be

performed in the presence of children bear absolutely no similarities to the principal-agent relationship. It would thus be inappropriate to apply the secondary definition of *Black's Law Dictionary* to Appellant's case. We conclude,"[t]herefore, it is the first definition of 'presence' in *Black's Law Dictionary*—and all of the similar definitions in lay dictionaries—that should guide us in the instant case. And in those definitions, there is no implication that 'awareness' is required for one person to be 'in the presence of' another."[110]

While we are confident that this approach is well-reasoned and sound within the bounds of our usual statutory interpretation frameworks, we also find that this approach simply makes sense. At bottom, this understanding comports with our superior court's earliest interpretation of the type of statute at issue. In *Brown*, the CMA determined that the predecessor statute to Article 120b(c), UCMJ, was intended to criminalize acts which have a tendency to cause harm to a victim, regardless of whether the victim "is aware of the nature of the act or the danger."[111] The phrase "in the presence of" for the purposes of Article 120b(c), UCMJ, "simply means that one person is in the immediate vicinity of another person."[112]

The approach we now adopt is also free from the ambiguities and inconsistent results created by application of our prior holding in *Schmidt I*. On its face, our prior holding seems straightforward and workable: " . . . with respect to the offense of sexual abuse of a child by indecent conduct, in order for the conduct to be done 'in the presence of' a child, there must be a sufficient sensory connection for the child to be aware of it."[113] However, strange results arise when considering the application of this interpretation of the law to facts that may feasibly arise. Take for example an accused who is charged under the statute for sexually abusing a child by masturbating in front of his step-child because he was sexually aroused by the child. Assume for this hypothetical that the accused's step-child suffers from a severe mental disability that prevents him from connecting to the world around him and leaves him with the mental capacity and functioning of a one-year-old. Under *Schmidt I*, the accused's step-child lacked sufficient "sensory connection" and awareness to criminalize

---

signed by the testator in the presence of both witnesses, and the signatures of both witnesses must be made in the presence of the testator and in the presence of each other . . . .")).

[110] *Schmidt II*, 80 M.J. at 77 (CJ. Ohlson, concurring in the judgment).

[111] *Id.*

[112] *Id.* at 78.

[113] *Schmidt I*, 80 M.J. at 586.

the accused's actions. It cannot be the case that the accused would be exposed to no more criminal liability for masturbating before his step-child than if he would under an indecent exposure framework. Were the minor at issue in the example an infant, much the same problem would apply: a newborn likely lacks the necessary sensory connections with the accused to be aware of and appreciate the conduct.

Consider, too, our prior holding in *Schmidt I* would similarly fall short of protecting minors who were awake during, but simply not alert to the indecent acts of the accused. Take for example a school assembly in an auditorium. As a reward for good behavior, the children are being shown a movie to round out their school day. During the film, an accused slips into the back of the darkened room and begins masturbating behind the crowd of children. The children, enthralled with the film, are not alerted to the actions of the accused just feet behind them. It simply cannot be the case that Congress intended for Article 120b(c), UCMJ, to only criminalize indecent acts performed in the presence of children who were alert, while carving out an exception for an accused who preyed upon vulnerable, unalert, victims.[114]

"We assume that Congress is aware of existing law when it passes legislation."[115] After CAAF's decision in *Miller*, Congress updated the statute. To fill the "gap created by *Knowles* and *Miller*", Congress more broadly defined "in the presence of a child" to include "via any communication technology."[116] When Congress did so, they were surely well aware of Article 120, UCMJ. Specifically, in Article 120(b)(2)(B), Congress criminalized committing a sexual act upon another person "when the person knows or reasonably should know that the other person is asleep, unconscious, or otherwise *unaware* that the sexual

---

[114] *See Schmidt II*, 82 M.J. at 77 (CJ. Ohlson, concurring in the judgment) (citing *United States v. Finley*, 726 F.3d 483, 495 (3d Cir. 2013) ("It would be absurd to suppose that Congress intended the statute to protect children actively involved in sexually explicit conduct, but not protect children who are passively involved in sexually explicit conduct while sleeping, when they are considerably more vulnerable."). Also *See United States v. O'Neal*, 835 F. App'x 70, 72 (6th Cir. 2020) ("Even if the minor is unaware of the masturbation (perhaps because the child is asleep), such conduct creates serious risks anyway because the child could wake up or find out about it after the fact.").

[115] *United States v. McDonald*, 78 M.J. 376, 380 (C.A.A.F. 2019) (quoting *Miles v. Apex Marine Corps*, 498 U.S. 19, 32 (1990)).

[116] *MCM*, pt. IV, ¶ 45b.h(5)(D) (2016 ed.). *See Schmidt II*, 82 M.J. at 73.

act is occurring."[117] Demonstrably, had Congress desired to limit the scope of Article 120b(c), UCMJ, to just those minors that were aware of the indecent act being performed, they had the language to do so. Instead, Congress did not limit the scope of Article 120b(c), UCMJ, to a particular category of child victims. We find that in so doing they threw "a cloak of protection around minors … to discourage sexual deviants from performing with or before them."[118] Further, we would find it incredible to conclude that Congress wished to protect adults from sex acts performed on them while they were "unaware," but desired to exempt from criminal liability under Article 120b(c), UCMJ, individuals who performed indecent acts done in the presence of a sleeping or unaware child.[119]

Our prior holding in *Schmidt I* would also cut against the intended aims of the predecessor to Article 120b(c) as articulated by the CMA in *Brown*. There, the Court said of the predecessor statute that the goal of the legislation was "to protect children under a certain age from those acts which have a tendency to corrupt their morals . . . ."[120] Accepting the premise that the purpose of legislation criminalizing sexual abuse of children is, at least partially, the protection of children, reading an awareness element into Article 120b(c), UCMJ would do just the opposite. Many investigations into child sexual abuse are not initiated by the victim. In such a case, it may be unclear from the facts available during the investigation whether the child was aware of the conduct at issue. The facts before us in Appellant's case, where there was some ambiguity as to whether the victim, Miss Bravo, was awake demonstrate this possibility. Under *Schmidt I,* the government would likely frequently be required to gather

---

[117] Article 120b(2)(B), UCMJ (emphasis added).

[118] *Brown*, 3 C.M.A. at 461, 13 C.M.R. at 17.

[119] We note, as well, that this understanding comports with our unpublished opinion in *United States v. Lopez*, No. 201700252, 2019 CCA LEXIS 37 (N-M Ct. Crim. App. Jan. 31, 2019) (unpublished). In *Lopez*, we held that a conviction could be upheld under Article 120b(c) for "intentionally exposing one's genitalia . . . to a child . . . with an intent to . . . arouse or gratify the sexual desire of any person" when the child victim was asleep. *Lopez*, 2019 CCA LEXIS 27 at *5. In *Schmidt I*, we distinguished our opinion there from the holding in *Lopez*, noting that exposing one's genitalia to a child was a separately defined offense which did not use the "in the presence of" language. *Schmidt I*, 80 M.J. at 597 n.8. Now, having determined that neither the language at issue in *Schmidt* nor the language in *Lopez* requires proof of the victim's awareness, we find merit in our brief analysis in *Lopez* as applied to the instant case. Specifically, both definitions of "lewd act" as used in Article 120b(c) place "focus on the appellant's actions, not [the victim's] awareness." *Lopez*, 2019 CCA LEXIS 37 at *6.

[120] *Brown*, 3 C.M.A. at 457, 13 C.M.R. at 13.

evidence of the victim's awareness of a lewd act performed in their proximity. This evidence gathering would require alerting the child to the fact that an act occurred—creating a secondary harm that may not have existed otherwise. We find this result incompatible with Congressional intent.

We appreciate that concerns may arise that our holding, which broadens the reach of the statute from its current posture under *Schmidt I*, may sweep into Article 120b(c), UCMJ, conduct that Congress never intended to criminalize. We now briefly turn to address such speculative concerns to evaluate whether our holding would serve to erroneously capture otherwise innocent conduct within the statute. We are convinced that it will not.

Consider a married couple who live together in small quarters – such as a studio apartment. The couple has a young child who sleeps in a crib near their bed. One night, after the child has fallen asleep, the couple engages in sexual intercourse in their own bed. The couple desires to have separate spaces for their child and themselves, but finds no harm in engaging in marital intimacies while the child is asleep and unaware of their conduct. We find that on these facts alone, no part of Article 120b(c), UCMJ, would criminalize this conduct. A "lewd act" within the meaning of the statute has two definitions potentially applicable to this fact pattern. First, this situation may contemplate the "intentional[] expos[ure]" of "one's genitalia anus, buttocks, or female areola or nipple to a child by any means."[121] However, to constitute a criminal offense, such intentional exposure to the child would require the proper criminal intent. Here, the couple would have to complete the exposure to the child "with an intent to abuse, humiliate, or degrade any person" or for the purpose of "arousing or gratifying the sexual desire of any person."[122] Second, the situation may contemplate "indecent conduct, intentionally done with or in the presence of a child."[123] Similarly, to constitute a criminal offense such indecent acts must amount to "a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to *common propriety*, and tends to excite sexual desire or deprave morals with respect to sexual relations."[124]

To be guilty of sexual abuse of a child, the government would have to provide evidence that the accused held in his or her mind some form of criminal

---

[121] Article 120b(h)(5)(B), UCMJ (2018).

[122] *Id.*

[123] Article 120b(h)(5)(D), UCMJ (2018).

[124] *Id.* (emphasis added).

*mens rea*. The factual circumstances of Appellant's case provides a useful contrast to the innocent actors in the example above. Appellant was convicted of child sexual abuse for counseling Ms. Charles to intentionally masturbate in the presence of her daughter, Miss Bravo. In the text messages introduced by the Government at trial, Miss Bravo is the subject and motivation for the indecent acts themselves.[125] Specifically, Appellant and Ms. Charles discussed engaging in sexual intercourse with Miss Bravo, undressing Miss Bravo, and what she was doing while Ms. Charles was masturbating beside her.[126] In light of these two scenarios, it is clear from the construction of the statute that Congress intended to criminalize conduct like Appellant's, but did not intend to criminalize conduct like that of the hypothetical couple. In both scenarios, acts of a sexual nature were intentionally done in the presence of a child. However, only in the latter example did that indecent conduct amount "to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tend[ed] to excite sexual desire or deprave morals with respect to sexual relations."[127] Accordingly, our "definition places the focus on appellant's actions, not [the victim's] awareness," and we are confident that our holding does not cause Article 120b(c) to criminalize the conduct of innocent actors.[128]

*5. As Awareness is not Required Under the Statute, the Military Judge Did Not Abuse His Discretion by Accepting Appellant's Plea to Sexual Abuse of a Child*

We review a military judge's decision to accept a guilty plea for an abuse of discretion.[129] "In doing so, we apply the substantial basis test, looking at whether there is something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea."[130] A military judge abuses this discretion if he fails to obtain

---

[125] Prosecution Exhibit 5.

[126] *Id*.

[127] Article 120b(h)(5)(D), UCMJ (2018).

[128] *Lopez*, 2019 CCA LEXIS 37 at *5.

[129] *Inabinette*, 66 M.J. at 322 (citing *United States v. Jordan*, 57 M.J. 236, 238 (C.A.A.F. 2002).

[130] *Id*.

from the accused an adequate factual basis to support the plea—an area in which we afford significant deference."[131]

Appellant argues that the Record provides a substantial basis in fact and law to question the providence of Appellant's guilty plea to Charge I, Specification 2, sexual abuse of a child in violation of Article 120b, UCMJ. First, Appellant submits that the text messages themselves contradict the statements made to the military judge during his plea colloquy that he believed Miss Bravo to be awake. Specifically, Appellant highlights that there is a ten-minute gap between Ms. Charles texting that Miss Bravo's eyes were closed and that she was not sure if she was awake, and Appellant's reply telling Ms. Charles to "play."[132]

Second, Appellant contends that, even if he believed that Miss Bravo was awake, his encouragement was not physical contact with Miss Bravo. Further, Appellant submits that even if Miss Bravo may have been awake while he was encouraging Ms. Charles to masturbate, the crime itself was not complete until Ms. Charles actually committed indecent conduct in the presence of Miss Bravo. Appellant contends that Miss Bravo was asleep before Ms. Charles began the indecent act, and thus he cannot be guilty of Charge I, Specification 2 because the lewd act was not then committed in the presence of a child. Finally, Appellant notes that the military judge accepted Appellant's plea based upon his reading of *United States v. Lopez* and argues that, per our opinion in *Schmidt I*, such reliance was misplaced where the indecent exposure at issue in *Lopez* did not require that the act be done "in the presence" of a child.[133]

We find that, because the statutory stricture that the indecent act must be done "in the presence" of a child to constitute a lewd act does *not* require the child's awareness, Appellant was provident in his pleas.

The elements of sexual abuse of a child, as charged in Appellant's case, in violation of Article 120b(c), UCMJ, are: (1) that Appellant committed a lewd act upon Miss Bravo by engaging in indecent conduct, to wit: counseling Ms. Charles to engage in indecent conduct (masturbation, intentionally done in the presence of Miss Bravo); (2) That, at the time, Miss Bravo had not attained the age of 16 years, and; (3) that the conduct amounted to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and

---

[131] *United States v. Inabinette*, 66 M.J. 320 (C.A.A.F. 2008).

[132] Pros. Ex. 5 at 8.

[133] *Lopez*, 2019 CCA LEXIS 37.

repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations.

During the plea colloquy with the military judge, Appellant admitted to performing acts to satisfy each element of the offense. Specifically, Appellant admitted to counseling Ms. Charles to engage in indecent conduct by masturbating while her daughter was in the bed next to her. The military judge elicited the following facts from Appellant:

> MJ: So, Staff Sergeant Tabor, we were discussing your guilty plea to Specification 2 of Charge I, sexual abuse of a child, and there was some confusion as to whether or not you believed that [Miss Bravo] was awake when her mother was masturbating, as you had counseled her to do or encouraged her to do; is that correct?
>
> ACC: Sir, after . . . reviewing the evidence and talking with the counsel, the text messages were, "Was gonna masturbate when she fell asleep but she is still awake." And I said, "Do it anyway." And she said, "She's in bed with me." And then I said, "Even if she's awake do it. Hotter if she is."
>
> . . . .
>
> MJ: Okay. So based on those text messages, do you believe that at certain parts during this interaction when you were encouraging [Ms. Charles] to masturbate in front of her daughter that she was, in fact, awake?
>
> ACC: Yes, sir. I believed so shortly after she sent me photos of her masturbating.
>
> . . . .
>
> MJ: And this was—as in conjunction with you counseling her intentionally to do so?
>
> ACC: Yes , sir.
>
> . . . .
>
> MJ : Do you agree and admit that this intentional exposure of her vagina and masturbating in front of [Miss Bravo] was with the specific intent to gratify your sexual desire?
>
> ACC: Yes, sir.
>
> MJ: It was to gratify your sexual desire?

ACC:  Yes, sir.

    . . . .

 MJ:  Did this—masturbating in front of her—amount to a form of immorality relating to sexual impurity, which is grossly vulgar, obscene, and repugnant to common propriety and tends to excite the sexual desire or deprave morals with respect to sexual relations?

ACC:  Yes , sir.

 MJ:  How so?

ACC:  I understand that this conduct, of [Ms. Charles] masturbating in the presence of [Miss Bravo] amounted to a form of immorality relating to sexual impurity that's gross, vulgar, obscene, or repugnant to common propriety.

 MJ:  Why? . . . .

ACC:  Because of her touching her vagina and masturbating in front of her daughter is gross and vulgar.

 MJ:  And it excited sexual desires and deprave morals?

ACC:  Yes, sir .

 MJ-:  Whose?

    . . . .

ACC:  Sir, myself and [Ms. Charles]

 MJ:  Again, there was no mistake , on your part, as to her age? You were well aware that she was ten years old?

ACC:  Yes, sir.

 MJ:  Could you have avoided engaging in this behavior if you had wanted to?

ACC:  Yes, sir.

 MJ:  Did anyone or anything force you to encourage [Ms. Charles] to masturbate in front of her daughter?

ACC:  No, sir.

 MJ:  Do you believe you had any legal justification or excuse for what you did?

ACC:  No, sir.

MJ:  Do you believe that your actions were wrongful?

ACC:  Yes, sir.

MJ:  Why?

ACC:  Because she masturbated in the presence of her daughter.

MJ:  Did you know it was wrong to engage in sexual activity or lewd acts in front of a child?

ACC:  Yes.

. . . .

MJ:  So you would agree that engaging in lewd acts in front of a child is wrongful?

ACC:  Yes.[134]

We are convinced that the elements were satisfied. Appellant admitted that (1) Appellant's exchange with Ms. Charles where he encouraged her to masturbate beside (in the presence of) Miss Bravo, as described to the military judge and contained in the stipulation of fact, constituted a lewd act;[135] (2) Appellant was well aware at the time that Miss Bravo was ten years-old; and, (3) Appellant admitted that the conduct of encouraging Ms. Charles to masturbate next to Miss Bravo amounted to a form of immorality relating to sexual impurity which was grossly vulgar, obscene, and repugnant to common propriety, and excited Appellant's sexual desire with respect to sexual relations. Based on Appellant's admissions, it was not an abuse of discretion for the military judge to accept Appellant's guilty plea.

The separate opinion authored by Senior Judge Gaston would likewise conclude that Appellant was provident in his pleas; however, the separate opinion would arrive at that conclusion under the existing framework of *Schmidt I*.[136] We respectfully disagree. The separate opinion maintains that, under *Schmidt I*, in order for indecent conduct to be done "in the presence of" a child, "there

---

[134] R. at 428–33.

[135] Whether Miss Bravo was awake or asleep is now an irrelevant consideration in light of our holding.

[136] *See* discussion *infra United States v. Tabor*, ___ M.J. ___at ___, slip op. at 58 *et seq.* (Gaston, S.J., concurring in part, dissenting in part, and concurring in the judgment).

must be a sufficiency sensory connection for the child to be aware of it."[137] Applying such an interpretation would, in our view, "raise a substantial question regarding [A]ppellant's guilty plea" based on the facts and the law.[138] As a preliminary matter, this view of the law would render any lewd act committed while Miss Bravo was asleep ineligible to satisfy the elements of the statute. We are then left to examine the record to determine whether Appellant believed that Miss Bravo was awake and had a "sensory awareness" of the conduct being performed next to her by Ms. Charles.[139]

In the instant case, we are left only with what Appellant knew at the time he encouraged Ms. Charles to masturbate, which is contained in Prosecution Exhibit 5, their text message exchange, and which is supplemented by Appellant's colloquy with the military judge. Appellant told the military judge that he believed that Miss Bravo was awake "shortly after [Ms. Charles] sent [him] photos of her masturbating."[140] Appellant's text messages contradict his statements to the military judge during the plea colloquy that he believed her to be awake. Ms. Charles told Appellant that she intended to begin masturbating when Miss Bravo was asleep.[141] Prior to Ms. Charles masturbating, she sent a photo to Appellant that depicted Miss Bravo with her back to Ms. Charles.[142] She also told Appellant that Miss Bravo's eyes were closed and she was not sure if she was awake.[143] Ten minutes then elapsed before Appellant instructed Ms. Charles to "play."[144]

Even if the military judge felt satisfied that at some point during the masturbation Miss Bravo was awake, there is zero basis in the record that suggests that she was aware, as required under *Schmidt I*. Simply being awake is not enough. The record must support that Miss Bravo had a sufficient sensory connection to what was occurring, and that is lacking here. Further, Appellant's

---

[137] *Id.*, ___ M.J. at ___, slip op. at 61 (quoting *Schmidt I*, 80 M.J. at 598).

[138] *Inabinette*, 66 M.J. at 322 (citing *United States v. Jordan*, 57 M.J. 236, 238 (C.A.A.F. 2002).

[139] *Schmidt*, 80 M.J. at 598.

[140] R. at 428–29.

[141] Pros. Ex. 5 at 7

[142] R. at 419–24.

[143] Pros. Ex. 5 at 7–8

[144] *Id.* at 8.

belief that she was awake is irrelevant, if, as she was here, she was asleep and unaware.

Appellant's answers to the military judge's questions were insufficient to resolve these inconsistencies and support his plea that he encouraged Ms. Charles to masturbate next to Miss Bravo at a time when she had a sensory awareness of the conduct. Were the framework from *Schmidt I* to be applied to these facts, we would, however, find that Appellant is nonetheless guilty of the lesser-included offense of attempt.

## B. The Military Judge Did Not Abuse His Discretion in Denying Appellant's Motion to Recuse Himself

We review a military judge's decision not to recuse himself for an abuse of discretion.[145] The abuse of discretion standard calls for more than a mere difference of opinion. The challenged decision must be "arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[146]

An accused has a constitutional right to an impartial judge.[147] "There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle . . . ."[148] The moving party has "the burden of establishing a reasonable factual basis for disqualification," which requires "more than a mere surmise or conjecture."[149] Disqualification is required when "that military judge's impartiality might reasonably be questioned" and such disqualification can be the result of actual bias or the mere appearance of bias.[150, 151] The test under R.C.M. 902(a) is objective, asking whether there exists "any conduct that would lead a reasonable man knowing

---

[145] *United States v. Hoffmann*, No. 201400067, 2020 CCA LEXIS 198 at *46 (N-M Ct. Crim. App. June 8, 2020).

[146] *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015) (cleaned up).

[147] *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001).

[148] *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001).

[149] *Wilson v. Ouelette*, 34 M.J. 798, 799 (N.M.C.M.R. 1991) (citing *United States v. Allen*, 31 M.J. 572, 601 (N.M.C.M.R. 1990), aff'd, 33 M.J. 209 (C.M.A. 1991)).

[150] R.C.M. 902(a).

[151] The appearance standard is designed to enhance public confidence in the integrity of the military judicial system. *Quintanilla*, 56 M.J. at 45.

all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned."[152]

We conclude that Appellant has failed to establish any actual bias and that he waived the issue of apparent bias. We first analyze the question of actual bias. Rule 902(b) specifically addresses situations in which the military judge has a duty to disqualify himself or herself for actual bias. Here, Appellant contends that the military judge had a duty to disqualify himself where he had "a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding" or had "acted as counsel . . . in the same case generally."[153] "To be disqualifying under R.C.M. 902(b)(1) the judge's bias must be based upon extra-judicial, personal knowledge, not knowledge gained through the performance of judicial duties."[154] "'Personal' means the 'bias or prejudice' must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case."[155]

The military judge disclosed that in June 2017, he was serving as the Regional Trial Counsel [RTC] for Legal Service Support Section West, where he was in a supervisory and training role over the Senior Trial Counsel [STC] at Marine Corps Air Station [MCAS] Miramar. That month, the Naval Criminal Investigative Service [NCIS] agent assigned to investigate Appellant's case received a printout of Appellant's text messages with Ms. Charles. Unsure what criminal offenses to investigate, the NCIS agent consulted with the STC at MCAS Miramar, who advised him to investigate evidence of indecent exposure and indecent language and detailed a trial counsel to Appellant's case during this investigatory stage. The military judge, while RTC, did not have any discussions regarding Appellant's case, but was copied on an email containing a summary of Appellant's case along with several other high-visibility case summaries. The military judge left the RTC position the following month.

Appellant argued at trial and argues on appeal that the military judge should have recused himself because, as RTC, he held a prosecutorial role during the investigation of this case. During voir dire of the military judge, trial defense counsel elicited from the military judge his responsibilities in his role as RTC, including: discussing cases with STCs and trial counsel; providing recommendations on detailing trial counsel to cases; conducting regular training

---

[152] *Butcher*, 56 M.J. at 91 (cleaned up).

[153] Rule for Courts-Martial 902(b)(1)–(2).

[154] *United States v. Wiggers*, 25 M.J. 587, 592 (A.C.M.R. 1987) (citation omitted).

[155] *Black*, 80 M.J. at 574 (cleaned up).

for STCs and trial counsel; consulting with NCIS; and serving as the reporting senior for the region's STCs. Arguing that the military judge's impartiality may be questioned given that his time as RTC overlapped the initial investigation of Appellant, Appellant's defense counsel made a verbal motion for the military judge to recuse himself. After consultation with other members of the judiciary, including the chief trial judge, the military judge provided a written ruling denying defense counsel's motion to recuse himself. In his written ruling, the military judge stated that he had no knowledge about Appellant's case from his time as the RTC, nor did he have any personal bias against any party to Appellant's case.[156]

Appellant concedes in his brief that the military judge did not appear to have "much, if any, actual knowledge of the case," but argues that the military judge did hold a prosecutorial role during the time of the investigation as captured by R.C.M. 902(b)(2).[157] We disagree. In our review, we find the record devoid of any evidence which would support a claim of actual bias. The fact that the military judge held a role as RTC during the pre-preferral investigatory steps in Appellant's case, without more, is insufficient to support a claim under R.C.M. 902(b). While that fact alone may be relevant to a consideration for apparent bias under R.C.M. 902(a), to the extent that appellant relies upon R.C.M. 902(b) for relief, that reliance is misplaced.

Turning to the question of apparent bias, we find that Appellant waived the issue of apparent bias under R.C.M. 902(a).[158] Whether an appellant has waived a claim is a legal question we review de novo.[159] "Unlike claims based on actual bias, disqualification under R.C.M. 902(a) is subject to waiver after full disclosure on the record of the basis for disqualification."[160]

Here, the basis for Appellant's claim of apparent bias under R.C.M. 902(a) is the role of the military judge as RTC during the early stages of law enforcement's investigation into Appellant. We find that Appellant, having conducted voir dire to inquire into this very issue, was fully informed and aware of the extent of the military judge's role as RTC when he agreed to waive all waivable

---

[156] App. Ex. LXXXI at 11–12.

[157] Appellant's Brief at 21.

[158] Waiver is the intentional relinquishment or abandonment of a known right. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020).

[159] *Id*.

[160] *Black*, 80 M.J. at 574 (citing R.C.M. 902(e); *United States v. Quintanilla*, 56 M.J. 37, 77 (C.A.A.F. 2001)).

motions in accordance with his pretrial agreement and when he elected trial by military judge alone knowing that the military judge would be the trier of fact and sentencing authority. Accordingly, we find that Appellant waived any claim for disqualification of the military judge under R.C.M. 902(a).

Even assuming Appellant did not waive the claim, we find no error in the military judge's decision not to recuse himself. In *United States v. Hoffman*, this Court reviewed the appellant's claim, inter alia, that the military judge abused his discretion by denying appellant's motion for recusal.[161] There, appellant was accused of committing indecent liberties with a child and child enticement, in violation of Articles 120 and 134, UCMJ. During voir dire of the military judge, appellant's defense counsel elicited that the military judge had served as the officer in charge of the legal services support section that was involved with the investigation of Appellant's case prior to charges being filed.[162] In that role, the military judge served as the reporting senior for the Military Justice Officer and was copied on correspondence with NCIS involving ongoing investigations. In *Hoffmann*, we took particular note of the fact that there was no evidence that the military judge had actual knowledge of the appellant's case, no evidence that the military judge acted as trial counsel, and no evidence that the military judge remembered any facts from the appellant's case.[163]

In the present case, there is likewise no evidence that the military judge ever acted in the role of trial counsel had any knowledge of the facts of Appellant's case. Neither the STC nor the detailed trial counsel had any recollection of discussing Appellant's case with the military judge. Although the military judge was copied on an email written by the STC which contained a summary of Appellant's case, the military judge stated he had no recollection of Appellant's case from his time as RTC.[164] Further, the military judge was no longer serving as RTC by the time charges against Appellant were preferred.[165] Fi-

---

[161] *United States v. Hoffmann*, No. 201400067, 2020 CCA LEXIS 198 (N-M. Ct. Crim. App. June 8, 2020) (unpublished) [*Hoffman II*].

[162] *United States v. Hoffmann*, No. 201400067, 2018 CCA LEXIS 326 at 29* (N-M. Ct. Crim. App. July 9, 2018) (unpublished) [*Hoffman I*], *rev. on other grounds by Hoffmann II.*

[163] *Hoffmann II*, 2020 CCA LEXIS 198 at *47.

[164] App. Ex. LXXXI at 3.

[165] *Id.*

nally, the military judge stated that during the time law enforcement was investigating Appellant and consulting with the STC, the military judge's role was purely administrative as he prepared to turnover with his relief and take command of another.[166] Given these facts, we find that an objectively reasonable person aware of all the relevant facts concerning the military judge's role as RTC would have no questions about the military judge's impartiality. We find no error in the military judge's decision to deny Appellant's motion and not recuse himself.

## C. Post-Trial Processing Delay

Appellant was sentenced on 12 June 2020. Six days later, Appellant's trial defense counsel submitted a request for deferral of adjudged forfeitures, which was granted by the Convening Authority just five days after it was received. The military judge verified the Record of Trial and signed the Entry of Judgment on 20 August 2020. The detailed court reporter certified the Record of Trial on 21 August 2020. However, Appellant's case was not docketed with this Court until 22 February 2021, 256 days after announcement of sentence. Appellant argues that the 256-day delay is presumptively unreasonable and warrants relief.

Servicemembers convicted of a crime have a constitutional due process right to "timely review and appeal of courts-marital convictions."[167] Whether a service member has been denied his due process right to speedy appellate review is a question of law we review de novo.[168]

CAAF promulgated a four-factor balancing test in *United States v. Moreno* to determine whether post-trial delay constitutes a due process violation.[169] The factors are: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice."[170] No single *Moreno* factor is required, but a facially unreasonable

---

[166] *Id.* at 2–4.

[167] *United States v. Merritt*, 72 M.J. 483, 489 (C.A.A.F. 2013).

[168] *United States v. Arriaga*, 70 M.J. 51, 55 (C.A.A.F. 2011).

[169] *United States v. Moreno,* 63 M.J. 129 (C.A.A.F. 2006).

[170] *Moreno*, 63 M.J. at 142.

length of time triggers the full due process analysis.[171] No single factor is dispositive.[172] Instead, we must "weigh all the factors collectively before deciding whether an accused's right to a speedy post-trial processing has been violated."[173] "If we conclude that an appellant has been denied the due process right to speedy post-trial review and appeal, we grant relief unless this court is convinced beyond a reasonable doubt that the constitutional error is harmless."[174] As we discussed recently in *United States v. Rivera*,[175] appellants have a right to records that are docketed with our court within 150 days from the execution of the entry of judgment [EOJ]. We will find presumptive unreasonable delay in cases that take longer than the required 150 days, and will look to the *Barker* factors to determine if relief is warranted.

### 1. Length of Delay

As noted above, the total length of time from EOJ until docketing with this court in this case was 256 days, which is 106 days more than the 150-day requirement per instruction and *Rivera*. This factor weighs in favor of Appellant.

### 2. Reasons for the Delay

Per affidavits attached to the record by the Government, the delay was due to Appellant's record of trial being misplaced in a storeroom. This factor weighs in favor of Appellant.

### 3. Demand for Speedy Trial

Appellant did not file a demand for speedy post trial review; thus, this favors factor weighs against him.

### 4. Prejudice to Appellant

In assessing the prejudice factor, courts consider: (1) prevention of oppressive incarceration; (2) minimization of anxiety and concern; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her

---

[171] *Id*. at 136.

[172] *United States v. Wilson*, 72 M.J. 347, 354–55 (C.A.A.F. 2013).

[173] *United States v. Delgado*, No. 201900065, 2021 CCA LEXIS 657 at *8 (N-M Ct. Crim. App. Dec. 8, 2021) (cleaned up).

[174] *United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006) (cleaned up).

[175] *United States v. Rivera*, 81 M.J. 741, 746 (N-M. Ct. Crim. App. 2021).

defenses in case of reversal and retrial, might be impaired.[176] Here, Appellant only alleges generalized anxiety during continued confinement pending appellate review. We find that this allegation of prejudice is not enough to warrant relief. Balancing these factors, we conclude that Appellant was not denied his due process right to speedy appellate review.

Despite finding no due process violation warranting relief, we still look to our affirmative obligation to consider sentence appropriateness, and look at "all the facts and circumstances reflected in the record, including [any] unexplained and unreasonable post-trial delay."[177] Here, Appellant's delay of over 100 days, due to government neglect in misplacing his record of trial, warrants relief in the form of one month's confinement, which we announce in our decretal paragraph.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and only so much of the sentence that includes a dishonorable discharge, seven years and five months' confinement, forfeiture of all pay and allowances, and reduction to E-1 are correct in law and fact. Accordingly, the findings and the sentence, as deemed appropriate by this Court, are **AFFIRMED**.[178]

---

[176] *Moreno*, 63 M.J. at 138–39.

[177] *United States v. Bodkins*, 60 M.J. 322, 324 (C.A.A.F. 2004) (quoting *Tardif*, 57 M.J. at 224.)

[178] Articles 59 & 66, UCMJ.

STEPHENS, Senior Judge (concurring):

I concur with the Opinion of the Court and recognize we are supposed to use a textualist approach to statutory interpretation. But I write separately to suggest a different methodology. When this Court hears cases en banc we have sometimes attempted to offer the Court of Appeals for the Armed Forces [CAAF] a menu of well-reasoned options to aid its final resolution of the legal issue.[1] I humbly suggest using textualism to interpret the prior version of this statute has contributed to the confusion over the meaning and effect of Article 120b(c), Uniform Code of Military Justice [UCMJ],[2] and whether it possesses some penumbric "awareness" element. I believe we could cut the modernist Gordian knot by returning to the classical tradition of statutory interpretation. The overall purpose of this statute is to promote the common good by criminalizing lewd acts done at Appellant's direction. I would affirm his conviction and find the extra element of awareness unnecessary.

Our Court does not regularly conduct statutory interpretation. When we do, we have followed CAAF's example of textualism (the Supreme Court does not always use textualism and its constitutional cousin, originalism). In *United States v. Alkazahg,* we interpreted the 1934 National Firearms Act and the 1968 Gun Control Act as a matter of first impression.[3] Central to the case was what the words "by a single function of the trigger" and "automatically" meant in the context of the statutes and the new agency rule from the Bureau of Alcohol, Tobacco, Firearms, and Explosives. We dutifully followed the textualist approach and consulted dictionaries from the 1930s and 1960s to discern what the "ordinary meaning of the word" meant at the time the relevant statutes were enacted. But the problem with a textualist approach is that at some point a judge has to make a *judgment* about the overall meaning of the statute, what result most comports with the statute's words and context, and, sometimes, what result avoids "absurdity."[4] This renders the textualist approach irrelevant or, even worse, allows space for judicial legislating. I will try to briefly

---

[1] *United States v. Begani* 79 M.J. 767 (N-M. Ct. Crim. App. 2020), *aff'd*, 81 M.J. 273 (C.A.A.F. 2021); *United States v. Brown*, 79 M.J. 833 (N-M. Ct. Crim. App. 2020), *aff'd*, 81 M.J. 1 (C.A.A.F. 2021).

[2] 10 U.S.C. § 920b(c).

[3] *United States v. Alkazahg*, 81 M.J. 764 (N-M. Ct. Crim. App. 2021).

[4] *See Smith v. United States*, 508 U.S. 223 (1993) (interpreting the term "use of a firearm" to include using it to barter in an illegal drug transaction rather than "using" it as a weapon).

explain how I believe the classical approach avoids the middleman and does not outsource the role of the judge to a dictionary.

## I. DISCUSSION

### A. Textualism and Progressivism

The textualist (and originalist) approach alluded to above has many champions. If I may generally use the terms textualist and originalist interchangeably, textualism, as expressed by Justice Gorsuch, means "[t]he text of the statute and only the text becomes law. Not a legislator's unexpressed intentions, not nuggets buried in legislative history, and certainly not the judge's personal policy preferences."[5] Originalism was a legal and political response to the perceived excesses of the progressivism of the Warren Court, particularly in the area of criminal justice. By most counts, six current Supreme Court justices consider themselves textualists. Justice Kagan, who would not normally be counted among the six, famously said, "We're all textualists now."[6]

Progressivism purports to expand individual liberties and rights in response to (or to shape) modern society's needs. To its proponents, this judicial philosophy includes analyzing statutes with "the evolving standard of decency that mark the progress of a maturing society"[7] in mind or considering whether the statute conflicts with the right to "define one's own concept of existence, of meaning, of the universe, and of the mystery of human life."[8] In practice, it sometimes looks more like the judge's personal "reasoned judgment" in the face of statutory or constitutional silence, or antipathy.[9] Our Court does not see a lot of the progressive approach, where fundamental legal rights are hidden in

---

[5] Neil Gorsuch, *A Republic, If You Can Keep It*, 132 (2019).

[6] Elena Kagan, *The Scalia Lecture: A Dialogue With Justice Kagan on the Reading of Statutes* at 8:28 (Nov. 17, 2015), https://today.law.harvard.edu/in-scalia-lecture -kagan-discusses-statutory-interpretation/.

[7] *TROP v. Dulles*, 356 U.S. 86, 101 (1958). Chief Justice Warren, writing for the Court, held the Eighth Amendment did not allow Congress to remove a soldier's U.S. citizenship for war-time desertion.

[8] *Planned Parenthood v. Casey*, 505 U.S. 833, 851 (1992). This passage by Justice Kennedy was also cited in his opinion for the Court in *Lawrence v. Texas*, 539 U.S. 558, 574 (2003). The same concept animated his opinion for the Court in *Obergefell v. Hodges*, 576 U.S. 644 (2015).

[9] *Casey*, 505 U.S. at 983 (Scalia, J., dissenting).

existing statutes or the text of the Constitution, only to be discerned by counsel.[10] Progressivism seems to be more suited for the rarified air of academia or the Supreme Court. At least at the working-class levels of the judiciary, textualism appears to be the default method for interpreting statutes.

## B. The Classical Approach

The classical approach has been out of favor for nearly a century. It was replaced with progressivism and then originalism in response. While originalism (and textualism) seems to have carried the day politically, its inability to fend off progressive convergence—even by its own practitioners—is evidence of its weakness as a judicial philosophy.[11] Perhaps the most visible proponent of the classical approach is Professor Vermeule of Harvard Law School, whose many articles on the subject and his most recent book lay out the arguments for it.[12] The classical judge makes decisions based on the common good, which can be broadly defined as what is desirable for the community's happiness, safety, and prosperity. It directs the judge to draw on the concepts of the natural law (*ius naturale)* and the laws of nations or peoples (*ius gentium*) when interpreting posited law (*lex*), whether it be a statute, an agency rule, or even a constitution. For example, the judge using the classical approach is to consider a statute as a man-made expression of a higher, un-enumerated law. The

---

[10] *See, e.g.*, *Begani*, 79 M.J. 767 (Fifth Amendment equal protection not violated when active duty military retirees subject to UCMJ when reservist retirees are not); *United States v. Causey*, ___ M.J. ___, No. 202000228, 2022 CCA LEXIS 176 (N-M. Ct. Crim. App. Mar. 23, 2022) (Sixth Amendment not violated because court-martial panels not required, like civilian criminal juries, to return unanimous verdicts).

[11] *Bostock v. Clayton County*, ___ U.S. ___, 140 S. Ct. 1731 (2020). Justice Gorsuch, writing for the Court, used textualism to interpret Title VII of the Civil Rights Acts of 1964's prohibition against discrimination based on "sex" to prohibit an employer from firing an employee "merely for being gay or transgender." Justice Alito, in a dissent joined by Justice Thomas, wrote "[t]he Court's opinion is like a pirate ship. It sails under a textualist flag, but what it actually represents is a theory of statutory interpretation that Justice Scalia excoriated—the theory that courts should 'update' old statutes so that they better reflect the current values of a society." *Id.* at 1755-56 (Alito, J., concurring). Steven Calabresi, a leading originalist/textualist and the editor of a 2007 Federalist Society book, *Originalism: A Quarter Century of Debate*, argued, post-*Obergefell*, that originalism mandated a constitutional right to same-sex marriage. *See* Steven G. Calabresi and Hannah M. Begley, *Originalism and Same-Sex Marriage*, 70 U. Miami L.R. 648 (2015).

[12] Adrian Vermeule, *Common Good Constitutionalism*, (2022).

reluctance to return to such an approach likely reflects legal positivism's complete and total victory over moderns.

Legal positivism—the theory that no law exists save for that made by valid political authority—demonstrates its inherent shortcomings when the judge must go beyond the statute. While positivists resort to "reason," or "the evolving standards of decency" or "the ordinary meaning" of the (sometimes deconstructed) text,[13] the classical view seeks the common good as understood in natural law and applies that to an indeterminate text.

Thomas Aquinas explained two ways natural law becomes posited law.[14] The first was when a general conclusion stems from its principle, such as proscribing murder from the principle that it is objectively wrong to harm an innocent person. The second way natural law effects posited law was explained by Aquinas's craftsman analogy where general ideas for the common good take specific form like a "craftsman who needs to turn the general idea of a house into the shape of this or that house."[15] I believe it would be fair to say Article 120b is a combination of the two, where the *lex* is an overall expression of the conclusion that it is always wrong to sexualize children and the resulting statute is the shape of "this or that house" after half-a-century of amendment. Either way, the statute did not come into existence *ex nihilo*, it stemmed from an unwritten idea—the *ius*.

The Framers, who were not positivists, textualists, or progressives, embraced natural law and the classical approach as they inherited it—not from their Enlightenment contemporaries—but from their medieval and classical forbears. Indeed, our Fifth and Sixth Amendments stem from Middle Age canonists extrapolating these rights from Biblical texts because such rights served the common good and comported with natural law.[16] This was centuries before humanist thinkers considered such rights "self-evident." William Blackstone and Sir Edward Coke were the preeminent legal sources for the Framers.

---

[13] Hyper-textualism combined with legal positivism combines the worst aspects of Derrida's deconstructionism ("There is nothing outside the text.") with Nietzsche's belief that "the power of command rises to the rank of supreme source of law." *See* Phillippe Nonet, *Essay: What is Positive Law?*, 100 Yale L.J. 667, 669 (1990).

[14] Thomas Aquinas, *Summa Theologica*, Question 95 *Of Human Law*, Article II, *Whether Every Human Law is Derived From the Natural Law?*.

[15] *Id.*

[16] R.H. Helmholz, *Natural Human Rights: The Perspective of Ius Commune*, 52 Cath. U.L. Rev. 301 (2003).

Blackstone's *Commentaries* is neatly divided into The Rights of Persons, The Rights of Things, Of Private Wrongs, and Of Public Wrongs, thus recognizing the different aspects of the body politic and the common good.[17] The preambles of the Declaration of Independence[18] and the Constitution[19] invoke natural law and the common good. Today natural law and the common good survive in the form of legal phrases such as "good cause," "arbitrary and capricious," "fundamental fairness," "reasonable," and the readily familiar, yet seemingly nebulous, "costs to the justice system" from Military Rule of Evidence 311(a)(3). So we should not look askance at interpreting a statute using the classical approach with the common good and natural law in mind.

## C. Interpreting Article 120b(c) for the Common Good

*United States v. Brown* and *United States v. Knowles* had set some parameters for the old indecent liberties statute.[20] They expressed the sense of the un-enumerated *ius naturale* codified in the *lex*. The modernist, whether textualist or progressive, would ask "what was *the* purpose of the statute" and look to the words, or when that fails, a dictionary and his own private judgment, or his own private judgment based on his political preferences for a desired outcome, or even a desire to avoid "absurdity." The classical judge would attempt to discern what common good is desired by the statute and recognize that a statute can have a purpose toward the good of the individual, a purpose toward the good of the community, and an additional good in harmonizing the interests between the two. A statute—a *lex*—is an attempt to codify a higher law that a nation or a people all know to be true and good, even if it were to limit individual freedom in certain circumstances.

---

[17] William Blackstone's *Commentaries on the Laws of England* is available online at the Yale Law School's Avalon Project. https://avalon.law.yale.edu/subject_menus /blackstone.asp. *See Common Good Constitutionalism* at 53–54.

[18] *See*, Carl J. Becker, *The Declaration of Independence: A Study in the History of Political Ideas* (1922). Chapter II: "Historical Antecedents of the Declaration: The Natural Rights Philosophy" discusses the intellectual background of the Declaration, its reliance on John Locke, and the impact of Sir Isaac Newton's *Principia* on the intellectual and political world.

[19] *See* Lee Strang, *The Role of the Common Good in Legal and Constitutional Interpretation*, 3 U. St. Thomas L.J. 48, 68 (2005) (Of the Preamble: "The People sought to re-order society to achieve justice, domestic peace, external defense, and the general welfare of the members of our society. This is the essence of the common good.")

[20] *United States v. Brown,* 3 C.M.A. 454, 13 C.M.R. 10 (1954); *United States v. Knowles,* 15 C.M.A. 404, 35 C.M.R. 376 (1969).

In 1954, *Brown* explained that a touching was not necessary for a conviction for indecent liberties when a soldier exposed himself to two sisters, aged seven and ten. From the opinion, one supposes the girls were aware of the exposure and saw the soldier's genitals, but it is not certain. There was a 22-year-old woman with the girls. Perhaps the woman was the only one who actually saw the soldier's exposure. Perhaps only one of the girls saw him. The *Brown* court does not dwell on the awareness, because it was irrelevant to the matter for purposes of findings and it was not "necessary that such a victim should be aware of the nature of the act or of the danger."[21] The *Brown* court did not resort to dictionaries or to word parsing to discern that a touching of the child was not a necessary element to be guilty of indecent liberties with a child. It understood the appellant's actions came within the ambit of the statute, even if the statute was not perfectly clear concerning touching. The *lex* was informed by the *ius*.

In 1965, a similar question arose in *Knowles*. Did the statute for indecent liberties with a child include making an obscene phone call? Chief Judge Quinn—who certainly understood *Brown* as he was on the *Brown* court—wrote for the Court of Military Appeals [CMA] using the same approach used in *Brown*. The harm contemplated by the indecent liberties statute simply was not met with just "hearing a voice over a telephone wire."[22] The *Knowles* court, with much less analysis than in *Brown*, concluded that just hearing the voice over the telephone was not enough and was covered by the separate offense of communicating obscene language. Again demonstrating a classical approach of interpreting the *lex* through the *ius*, the CMA commented it would "leave for such time as it may be directly before us" whether indecent liberties with a child may be "committed by performance of indecent acts and the use of obscene language over an audio-visual system."[23] The CMA's classical approach demonstrated that, at the time, the statute required physical presence given the realities of the *de minimis* harm of hearing obscene language via telephone, but the same statute—*without future legislative amendment*—could mean that future technology could remove the physical presence requirement because of the reckless and vulgar nature of the act and the possibility of harm to the child. This could not happen for the textualist. If the textualist judge found the statute meant presence was a requirement, then it must always mean that.

---

[21] *Brown*, 3 C.M.A. at 457, 13 C.M.R. at 13.

[22] *Knowles*, 15 C.M.A. at 406, 35 C.M.R. at 378.

[23] *Id.*

That is because for the textualist, "[t]he law is the law."[24] But the *Knowles* court recognized that an expressed *lex* crafted to conform to an unexpressed *ius*—substantial harm to children or society from vulgar sex acts directed toward children—must be read together. An audio-visual system, depending on the circumstances, could certainly amount to indecent liberties with a child under the statute, but that question was not before the *Knowles* court.

While the *Knowles* court (wisely) did not decide the audio-visual issue that was not before it, forty years later in *United States v. Miller*, CAAF used a textualist approach rather than a classical approach to decide the issue.[25] *Miller*'s methodology—along with a misreading of its dicta—is the source of Appellant's arguments here. In *Miller*, the appellant was masturbating on a webcam where the "child" could see him, but he could not see the child. The "child" was actually a civilian law enforcement detective. The question in *Miller* was whether he was guilty of attempted indecent liberties because he was in the "constructive presence" of (what he thought was) a child or whether the statute required his physical presence. CAAF held that constructive presence was not sufficient and that an accused had to be in the actual physical presence of the child.[26]

The statute from *Brown* to *Knowles* to *Miller* took some interesting turns. In *Brown*, an indecent liberty required an act "upon or with the body" of a child.[27] In 1954, *Brown* interpreted the 1951 statute to mean that a touching was not required. In 1965, *Knowles* interpreted that same statute to mean that "physical" presence was required. In 1969, the statute still had the "upon or with" language from the original statute, but had added, "the liberties must be taken in the physical presence of the child, but it is not essential that the evidence show physical contact between the accused and the child."[28] But by 1984, the statute—under its "no physical contact" sub-section removed the word "physical" and just stated that the indecent liberties had to be taken "in the presence of" a child.[29] The Presidential explanation to the offense, which is not

---

[24] Brett M. Kavanaugh, Book Review, *Fixing Statutory Interpretation, Judging Statutes*, 129 Harv. L. Rev. 2118 (2016).

[25] *United States v. Miller*, 67 M.J. 87 (C.A.A.F. 2008).

[26] *Id.* at 90.

[27] Article 134, UCMJ (1951).

[28] Article 134, UCMJ (1969).

[29] Article 134, UCMJ (1984)

binding, but merely "persuasive authority,"[30] alludes to the 1969 statutory language: "the liberties must be taken in the physical presence of the child, but physical contact is not required."[31] In 2008, the *Miller* court examined the 2005 indecent liberties statute unchanged from 1984.

Rather than *Miller* recognizing that the statute no longer specifically required "physical" presence and affirming the appellant's conviction for attempted indecent liberties, it looked to dictionaries for guidance. *Miller* cited a 2003 CAAF case for the proposition that statutory words should generally be given their "common and approved usage."[32] The 2003 CAAF case interpreted the term "child of" as it appeared in Military Rule of Evidence 504 and cited the "common and approved usage" canon as stated in *United Scenic Artists v. NLRB*,[33] a 1985 opinion by the Court of Appeals for the D.C. Circuit and subcited to the 1984 edition of *Sutherland Statutory Construction*. The D.C. Circuit case involved a labor dispute over a provision of the National Labor Relations Act. The Act did not permit the NLRB to find that a union had engaged in unfair labor practice unless the union's "object" was to force a neutral employer to cease doing business with the employer with whom the union was involved in a dispute. The D.C. Circuit considered "object" to be a synonym for "purpose" and cited to *2A Sutherland Statutory Construction* § 46.06 at 74 (4th ed. 1984). That section of *Sutherland* states:

> It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute. A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.[34]

Nothing in *Sutherland* or *United Scenic Artists* compels, or even justifies, resorting to dictionaries to determine whether presence can be understood to

---

[30] *Miller*, 67 M.J. at 89. CAAF recognized that Presidential explanations are not binding, citing *United States v. Miller*, 47 M.J. 352, 356 (C.A.A.F. 1997).

[31] Article 134, UCMJ (1969).

[32] *Miller*, 67 M.J. at 90 (citing *United States v. McCollum*, 58 M.J. 323, 340 (C.A.A.F. 2003)).

[33] 762 F.2d 1027 (D.C. Cir. 1985). A District Court judge for the District of Columbia sat by designation and authored the opinion, joined by Circuit Judges Robert Bork and Abner Mikva.

[34] *2A Sutherland Statutory Construction* § 46.06 at 74 (4th ed. 1984).

mean "virtual presence" as contemplated by *Knowles*, or to mean *only physical* presence as inserted, and then subsequently deleted by, the words of the statute.

Nevertheless, in *Miller*, CAAF looked to dictionaries. It used the 2004 edition of *Black's Law Dictionary* and the 2003 edition of *Merriam-Webster's Collegiate Dictionary*. Based on the textualist' s own "rules" the lay dictionary should have been consulted from either around 1969, when the word "presence" first entered the statute, or from 1984, when the word was moved from the statute to the Presidential explanations. That is when the word was inserted and its meaning was fixed in the statute. Granted, the word "presence" is not very different from 1969 to 1984 to 2005.[35] Admittedly, this could be considered a minor transgression. However, for the textualist, the use of *Black's Law Dictionary* for a common word would be a significant misstep. Chief Judge Ohlson, in his concurring opinion in *United States v. Schmidt* [*Schmidt II*], pointed out that using *Black's Law*, or any other technical dictionary such as a legal dictionary, should not be done "when a word has an easily graspable definition outside of a legal context."[36] And it is the use of *Black's Law* that is the source of the errors made by the various service courts of criminal appeals.

*Miller* mentioned the first definition of presence from *Black's Law*: "the state of fact of being in a particular place and time."[37] But it also mentions the second, more limited, circumstantial, and technical definition: "[c]lose physical proximity coupled with awareness."[38] Rather than emphasize the awareness aspect, CAAF merely concluded, "These definitions taken together compel the conclusion that 'physical presence' requires that an accused be in the same physical space as the victim."[39] This brief mention of the word "awareness"—wholly unnecessary to the holding—was *the* source and justification for lower

---

[35] *See, e.g.*, *Van Buren v. United States*, ___ U.S. ___, 141 S. Ct. 1648 (2021). Justice Barrett, a textualist, writes for the Court and is purposeful and meticulous in her citation of dictionaries from the relevant time periods. But three of the other textualists on the Court disagreed with the Court's application. "But *the text* makes one thing clear: Using a police database to obtain information in circumstances where that use is expressly forbidden is a crime." (emphasis added). *Id.* at 1699 (Thomas, J., dissenting).

[36] *United States v. Schmidt*, 82 M.J. 68, at 75 (C.A.A.F. 2022) (Ohlson, C.J., concurring in the judgment) [*Schmidt II*].

[37] *Miller*, 67 M.J. at 90.

[38] *Id.*

[39] *Id.*

courts' decisions in *United States v. Burkhart,*[40] *United States v. Anderson,*[41] *United States v. Gould*,[42] and this Court's opinion in *United States v. Schmidt* [*Schmidt I*].[43]

A classical approach to the *lex* in *Miller* would have picked up where *Knowles* left off, considered that Congress intentionally removed the word "physical" from the statute, and given due consideration to the non-binding Presidential explanation of physical. The harm contemplated by the *Brown* court was certainly present, albeit in a more remote way. But the additional harm contemplated by *Brown* and *Knowles* was also present. An accused who has taken the additional step to commit lewd acts in the online presence of a child—who might see and hear the acts—and where an accused knows this and is sexually gratified by this form of presence has crossed the threshold into indecent liberties by taking the "first step toward more serious sex crimes of a perverted nature."[44] It is not just that this audio-visual act features a "greater conjunction of the several senses of the victim" as compared with just an obscene telephone all, but such an act properly recognizes the danger of the accused's action to himself, the child, and to the community.[45] A court can certainly recognize that taking the additional brazen step of using an audio-visual system to conduct lewd acts upon a child is within the *ius* as expressed through a statute that criminalizes sexual acts upon or with children. The conduct is much more serious, and more dangerous, than an obscene phone call. The trespass on the common good—the happiness, safety, and prosperity of the community—is significantly elevated over an obscene phone call. In my view the appellant in *Miller* violated the *lex* as viewed through the lens of the *ius*. That being said, I recognize CAAF spoke with finality in *Miller* on whether or not that particular appellant violated the then-existing statute.

In response to *Miller*, Congress amended the statute. It also later moved indecent liberties into a new Article 120b statute, "rape and sexual assault of a child." It specifically amended the statute to allow for audio-visual technology

---

[40] 72 M.J. 590 (A.F. Ct. Crim. App. 2013).

[41] No. 201200499, 2013 CCA LEXIS 517 (N-M. Ct. Crim. App. June 27, 2013) (unpublished).

[42] No. ARMY 20120727, 2014 CCA LEXIS 694 (Army Ct. Crim. App. Sept. 16, 2014) (unpublished).

[43] 80 M.J. 586 (N-M. Ct. Crim. App. 2020), *aff'd*, ___ M.J. ___, No. 21-0004, 2022 CAAF LEXIS 139 (C.A.A.F. Feb. 11, 2022).

[44] *Brown*, 3 C.M.A. at 461, 13 C.M.R. at 17.

[45] *Knowles*, 15 C.M.A. at 406, 35 C.M.R. at 378.

to be used to commit an indecent liberty (now referred to as a "lewd act") upon a child. The statute and its statutory definitions:

> (c) Sexual Abuse of a Child.—Any person subject to this chapter who commits a lewd act upon a child is guilty of sexual abuse of a child and shall be punished as a court-martial may direct.
>
> . . . .
>
> (h) Definitions.—In this section:
>
> . . . .
>
> > (5) Lewd act.—The term "lewd act" means—
>
> . . . .
>
> > > (D) any indecent conduct, intentionally done with or in the presence of a child, including via any communication technology, that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations.[46]

In *Schmidt II,* Judge Sparks asks a fair question concerning Congressional intent to capture lewd acts committed by audio-visual means. When Congress added audio-visual means, which would imply the child victim would be aware of what the accused was doing, would not this also imply an awareness prong within the meaning of "in the presence of a child"? I believe a fair possible answer is that the statute does not imply that, not only for the reasons the majority opinion lays out using textualist analysis, but also, more simply, under a classical analysis. I also believe the classical analysis suffers less from charges of absurdity or inconsistency (pointed out by Senior Judge Gaston in his separate opinion) than the textual analysis.

In the classical view, there is no need to wrangle over the nature of the word "presence," whether for the "in-person" lewd acts or the "audio-visual" lewd acts. The fact that an accused has taken the additional brazen step to perform these acts and demonstrates a prurient sexual focus on the physical or audio-visual presence of a child is enough.

The textualist approach has two, or three, equally unsatisfying ways to square the circle. The statute could possess a different meaning for presence for each part of the statute—meaning that in-person presence has no awareness requirement, while the audio-visual presence does require the child victim

---

[46] Article 120b, UMCJ (2012 & Supp. IV 2017).

to be aware. Or, the statute cannot require awareness at all and define "presence"—using a lay dictionary—as being in the same "place," whether it is a physical or virtual space. The problem is that no one really uses the virtual and the physical definitions interchangeably. Certainly over the last two years (due to the COVID-19 pandemic) the entire industrialized world has learned the very real difference between being physically present at an actual meeting and being on a Zoom call. Finally, as Senior Judge Gaston's separate opinion does, a textualist may reach for a more technical definition and find "awareness" within the word "presence" despite it not existing in the statute, or any previous versions of the statute. So then, if textualism on its own terms provides such opposing or unsatisfactory answers, what exactly is its utility?

I am not suggesting judges become Platonic Guardians or look to penumbras or nebulous "evolving standards of decency" to interpret statutes. Recognizing that the written law is sometimes a poor reflection of the unwritten law—in this case, the idea that sexualizing children is always wrong—is a good starting point. To the extent that legal positivism is in the judge's way, discarding that idea that would be beneficial, too, because positivism recognizes nothing outside the *lex*—a stance which incidentally leaves *more* room for judges to govern, not less.

With the *ius* in mind, I believe the best reading of this (somewhat confusing) statute is that awareness is not an element the Government is required to prove either for a scenario where an accused is in the physical presence of the child victim or is in the virtual presence of the child using communication technology. The old indecent liberties statute used to be divided into offenses with and without physical contact. A new statute could clarify the type of presence required for physical and virtual lewd acts performed against children: "Any indecent conduct, intentionally done with or in the presence of a child, or done in the virtual presence of a child via any communication technology . . . . " The "awareness" prong would be irrelevant to either type of presence. The definition of a lewd act for "communicating indecent language" indicates that the "virtual presence" under Article 120b(c) would include the possibility of visual communication so as not to be redundant. [47] And as long as the remaining language of this specific intent crime remains in the statute, any "sleeping infant

---

[47] Article 120b(h)(5)(C), UCMJ (2012 & Supp. IV 2017).

in the room" scenarios simply cannot come into fruition absent prosecutors who attempt to charge cases without probable cause.[48]

**D. The Modern View of Consent in Sexual Matters**

Part of the difficulty of interpreting this statute—to the modernist—is the concept of consent and how central it is to whether sexual activity, or adjacent sexual activity such as contraception and abortion, is licit or illicit; with the payoff being that everything deemed licit becomes a constitutional right that is exempt from the rough-and-tumble of the democratic process. I am confident that for the last 15 years, practitioners of military justice have spent more time pondering sexual consent than any other group of lawyers in the world. And it will not shock anyone to observe that over the last half-century sexual conduct has permeated our society in nearly every possible way. Part of that permeation has been the re-casting of sexual mores, sometimes done by legislatures, but certainly aided by the judiciary when the voters had not yet acquiesced. It is probably also not controversial to observe that almost every type of sexual activity is beyond the proscription of the law and is shielded as a fundamental constitutional right. And that is where consent enters this fact pattern.

Though Western law universally proscribes sexual contact with children, it is difficult for the legal progressive (or even some of the originalists) to say *why* that is, other than the children being democratically determined to be too young to consent. Certainly the legal positivist has nothing germane at all to say about it. The text is the law and the law is the text.

With consent transforming nearly every type of private sexual activity into a licit act, or at least not an illicit one, we return to this fact pattern. Obviously, if a child is aware of a lewd act done in his presence he cannot as a matter of law give consent. He cannot give consent because he is, again as a matter of law, too young to do so and the law considers this harmful to the child. But what if consent is taken off the table? What if the nature of the act does not seek consent because it is at its core a unilateral act? And if done in a private setting, does it not quickly resemble what the Supreme Court has described as

---

[48] This is especially true with the Fiscal Year 2022 National Defense Authorization Act's creation of an Office of Special Trial Counsel for each Service, where an O-7 prosecutor will ultimately decide if charges under Article 120b, and other covered UCMJ offenses, are ever referred to a general court-martial in the first place. Hopefully this will limit the Service courts' need to use Article 66(d), UCMJ, factual sufficiency review to reverse convictions that should never have been referred to general court-martial. *See* National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, §§ 531–539C, 135 Stat. 1692–99 (2021).

a "liberty interest"? Indeed, we use the term "*Lawrence* liberty interest" to describe sexual conduct that is consensual and, thus, constitutional.

I submit that the criminality of Appellant's actions lies in his doing of them—or directing they be done—in the first place where the child is his sexual focus, regardless of whether the child is aware. Awareness seems tied to the concept of consent and its transformative properties. Where no awareness is had, then there is, and can be, no failure of consent. And a scenario where consent is *not necessary* to the sexual act is one that is, to modern senses, simply not criminal. I am certainly not saying this is the overt thought process of those who read awareness into the law, but it can be tempting to say "if the child is not harmed, then what business is the conduct to the state"; or more precisely, how could this be conduct that is proscribed by a statute that protects children from sexually vile conduct?

But does society not have the inherent right to put into words the objective common good of punishing those who sexualize children? I submit that the common good is not advanced when Appellant, or anyone for that matter, is allowed to masturbate in the presence of a child even when the child is unaware of the conduct for which he is the sexual focus. Even if the child is never "harmed" by such conduct, society is certainly harmed. An individual has been allowed to indulge a vulgar prurient interest towards a child and is taking increasingly reckless steps toward "more serious sex crimes of a perverted nature" as the *Brown* court stated in 1954.[49] How is this conduct not part and parcel of the legal arena of sexual abuse of a child? How is society unable to criminalize this as falling within the ambit of sexual crimes against children? Are we obligated to consign this conduct to Article 134 and not call it what it is? Could we understand the *Brown* court to mean merely that a sexual act coupled with the child's *awareness* is criminalized because that act could then lead to "more serious sex crimes?" If we are considering that masturbating to gratify one's sexual desires to an *aware* child is merely the precursor to *more serious* sexual crimes, and that an accused has not already committed a serious sexual crime in gratifying his sexual desires by masturbating in the presence of a sleeping or unaware child, then I'd say we've lost the plot. *Brown* did not mean that and neither should we.

---

[49] *Brown*, 3 C.M.A. at 461, 13 C.M.R. at 17.

## II. CONCLUSION

Perhaps it is too late for the classical approach and textualism is the best we can hope for in statutory construction. While society seems to have replaced Thomas Aquinas, Blackstone, and the Framers with Marx, Sartre, and Foucault, this does not mean the *ius naturale* has changed with respect to sexualizing children or that the *lex* does not attempt to capture that.[50] I would tear down the fortress of dictionaries and let judges be guided by a recognition of the common good that is promoted by the statute.[51] The *lex* should be informed by the *ius*.

Appellant directed that his agent perform a lewd act that was prurient and vulgar toward a child and did so in the child's presence. This is wrong for society and it is wrong for the individual. And it is much, much more serious than just "indecent conduct." This is sexual abuse of a child and it falls within the statute.

---

[50] Lest anyone misunderstand me, the classical judge's role is not to decide the common good for society and to legislate, but rather to discern the common good a legislature is trying to promote through the statute.

[51] *See Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) ("But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.") (Hand, J.). What if dictionaries drive the meaning of words rather than just record the accepted common usage and understanding? *See e.g.*, Katherine Fung, *Merriam-Webster Dictionary's Definition of Anti-Vaxxer Includes Opposing Mandates*, Newsweek, Oct. 7, 2021, https://www.newsweek.com /merriam–webster–dictionarys –definition–anti–vaxxer-includes-opposing-vaccine-mandates-1636624. If Derrida cheers our deconstruction of statutes, Orwell laughs bitterly over our reliance on modern dictionaries to interpret statutes, particularly in a future with *only* electronic dictionaries.

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

GASTON, Senior Judge, with whom Judge STEWART joins (concurring in part, dissenting in part, and concurring in the judgment):

The majority breaks new ground today in its broad interpretation of Article 120b(c)'s proscription of indecent conduct "in the presence of" a child. Unlike the offense of indecent conduct under Article 134, which is at root a crime against societal norms relating to sexual conduct, the offense to which Appellant pleaded guilty—sexual abuse of a child under Article 120b(c)—is the victim-oriented crime of "commit[ting] a lewd act upon a child."[1] The relevant statutory definition of "lewd act" reflects this difference by incorporating the element of indecent conduct from Article 134—defined as that "form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations"[2]—and adding the requirement that such conduct be "intentionally done with or in the presence of a child, including via any communication technology."[3] Seeking to convert Article 120b(c) from a victim-oriented offense into a societal one, the majority conflates these requirements using an interpretation of "in the presence of" that ignores key statutory changes made by Congress.

And needlessly so, because in this case Appellant intentionally counseled Ms. Charles to do exactly the kind of conduct that this Court in *United States v. Schmidt* [*Schmidt I*][4] held Article 120b(c) prohibits: openly masturbate next to Miss Bravo when she was not yet asleep, and thus was not just reasonably likely to observe the conduct (satisfying the requirement of "indecent conduct"),[5] but had "a sufficient sensory connection . . . to be aware of it" (satisfying the requirement that the indecent conduct be done "in the presence of a

---

[1] Article 120b(c), Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 920b(c).

[2] *Manual for Courts-Martial, United States* [*MCM*], pt. IV, para. 104.c.(1). Unless otherwise indicated, all references in the body of this opinion to the *Manual for Courts-Martial* are to the 2019 edition.

[3] Article 120b(h)(5)(D), UCMJ.

[4] *United States v. Schmidt*, 80 M.J. 586, 598 (N-M. Ct. Crim. App. 2020) [*Schmidt I*], *aff'd*, 82 M.J. 68 (C.A.A.F. 2022) [*Schmidt II*].

[5] While private, consensual sexual activity by or between adults is generally not punishable as indecent conduct absent aggravating circumstances, it may become indecent if it is "open and notorious," meaning intentionally committed "in such a place and under such circumstances that that it is reasonably likely to be seen by others even though others do not actually view the acts." *United States v. Sims*, 57 M.J. 419,

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

child").[6] The military judge, interpreting the law in the same manner as *Schmidt I* before that case was decided, identified the issue of whether Miss Bravo was asleep during the conduct and thoroughly addressed it during his providence inquiry. In response to the military judge's questions, Appellant admitted that he intentionally counseled Ms. Charles to remove her clothes and masturbate on the bed next to Miss Bravo while Miss Bravo was still awake and that he believed based on the evidence that Miss Bravo was awake for at least part of the time Ms. Charles did so. As the evidence presented at trial does not reflect otherwise, I would find that under *Schmidt I*, there is no substantial basis in law or fact to question Appellant's plea. Because the majority, incorrectly in my view, abrogates our holding in *Schmidt I*, I must respectfully dissent from my colleagues in that part of the majority opinion.

## I. DISCUSSION

The majority goes awry by interpreting the meaning of a word, "presence," when the issue before the Court requires the interpretation of a *phrase*, "in the presence of." The canons of statutory interpretation require that "we interpret words *and phrases* used in the UCMJ by examining [1] the ordinary meaning of the language, [2] the context in which the language is used, and [3] the broader statutory context."[7] All three of these inquiries support that this Court was correct in holding in *Schmidt I* that for indecent conduct to be done "in the presence of" a child, "there must be a sufficiency sensory connection for the child to be aware of it."[8]

### A. Ordinary Meaning of "in the Presence of"

While it is debatable whether the word "presence" is, as the majority maintains, descriptive solely of something existing at a particular location and time,[9] the ordinary meaning of the *phrase*, conduct done "in the presence of"

---

421 (C.A.A.F. 2002) (quoting *United States v. Izquierdo*, 51 M.J. 421, 423 (C.A.A.F. 1999)).

[6] *Schmidt I*, 80 M.J. at 598.

[7] *United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016) (emphasis added).

[8] *Schmidt I*, 80 M.J. at 598.

[9] Even some of the lay dictionaries cited by the majority define "presence" to include sensory awareness as an aspect of the word's meaning. *See* Merriam-Webster's Unabridged Online Dictionary, https://unabridged.merriam-webster.com/unabridged

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

another person, connotes not mere location or proximity, but awareness of the conduct by the person. Consider:

> "Dearly beloved, we are gathered here *in the presence of* God and these witnesses to join to this man and this woman in holy matrimony."

> "The dauphin's arrogance was discussed *in the presence of* the king."

> "Burr shot Hamilton *in the presence of* their seconds."

> "Corporal Smith made fun of the Sergeant Major's haircut *in the presence of* another marine."

None of these descriptions of conduct being done "in the presence of" other persons suggests that those other persons are asleep or otherwise unaware of the conduct. To the contrary, the phrase connotes through ordinary language that the conduct is occurring under circumstances where the other persons are aware of it.

Unlike standard dictionaries, which generally define words, not phrases, *Black's Law Dictionary* also provides definitional examples for the *phrase* at issue here, conduct done "in the presence of" another person. Each one of the examples it provides—which are not limited to the principles of agency or attestation as the majority maintains—connotes or implies some sort of sensory awareness of the conduct by that other person:

> "The agent was *in the presence of* the principal" is included as an illustration of the definition of "presence" as "[c]lose proximity coupled with *awareness*."[10]

> The "*presence-of-defendant* rule" is "the principle that a felony defendant is entitled to be present at every major stage of the

---

/presence (last visited Apr. 18, 2022) (including definition of "presence" as "the condition of being *within sight or call*, at hand") (emphasis added); Merriam-Webster's Collegiate Dictionary 982 (11th ed. 2020) (including definitions of "presence" as "the fact or condition of being present" and of "present" as "being *in view* or at hand") (emphasis added).

[10] Presence, *Black's Law Dictionary* (11th ed. 2019) (emphasis added).

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

criminal proceeding,"[11] where he or she will be able to see and/or hear what is occurring.

"For purposes of contempt, an action is *in the presence* of the court if it is committed *within the view of* the judge or other person in court . . . ."[12]

The "*presence-of-the-testator*" rule is "[t]he principle that a testator must be *aware (through sight or other sense)* that the witnesses are signing the will."[13]

The majority posits that these illustrative examples from *Black's Law Dictionary* should not be relied on because they speak only to the type of presence required for certain "legally significant events."[14] But that is exactly what is at issue here: determining what this same language means for the legally significant event of conduct that, under the circumstances, may be subject to criminal sanction as sexual abuse of a child.

Nor would this Court be alone in resorting to a legal dictionary like *Black's* to make the quintessential legal determination of interpreting what certain language in a criminal statute means. The Supreme Court of Florida did precisely that in *State v. Werner* when it interpreted similar language prohibiting "a lewd or lascivious act *in the presence of* any child" under a state statute intended to prohibit "lewd and lascivious acts *upon* children."[15] Consulting both lay and legal dictionaries, the court held that

> [a]pplying the legal as well as the common-sense meaning of the word "presence" to [the above statutory language] leads us to the conclusion that, while the child need not be able to articulate or even comprehend what the offender is doing, the child *must see*

---

[11] Presence-of-defendant rule, *Black's Law Dictionary* (11th ed. 2019) (emphasis added).

[12] Presence of the court, *Black's Law Dictionary* (11th ed. 2019) (emphasis added).

[13] Presence-of-the-testator rule, *Black's Law Dictionary* (11th ed. 2019) (emphasis added).

[14] *United States v. Tabor*, ___ M.J. ___, No. 202100046, slip op. at 24 (N-M Ct. Crim. App. May 25, 2022), https://www.jag.navy.mil/courts/documents/archive/2022/TABOR_202100046_EN-BANC_PUB-Concur-Dissent.pdf

[15] *State v. Werner*, 609 So. 2d 585, 586–87 (Fla. 1992).

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

> *or sense* that a lewd or lascivious act is taking place for a viola-
> tion to occur.[16]

This is the same conclusion this Court reached in *Schmidt I* with respect to Article 120b(c), that for indecent conduct to be done "in the presence of" a child, "there must be a sufficiency sensory connection for the child to be aware of it."[17]

## B. Context in Which "in the Presence of" Is Used

The conclusion that such sensory awareness is required for conduct to be done "in the presence of" a child is reinforced by the statute's inclusion of the modifying phrase, "including via any communication technology."[18] In the context of this modifying phrase, "in the presence of" is not about physical presence at all, since conduct done in the presence of another person "via communication technology" is *not* done in the person's physical presence, or "immediate vicinity," as the majority now calls it.[19] Rather, the doing of the conduct in one location is simply conveyed (i.e., communicated) to the person in another location through the transfer of sensory data (e.g., sight and sound).[20]

As such, it is virtually impossible to describe conduct as being done "in the presence of" another person *via communication technology* without connoting that the other person was, through the use of that technology, made aware of it.

> "The issue was debated during the weekly Teams meeting *in the presence of* the senior partners."

---

[16] *Id.* (emphasis added).

[17] *Schmidt I*, 80 M.J. at 598. Contrary to the majority's assertions, *Schmidt I* did *not* hold that the child must have sufficient *cognitive* understanding to appreciate the nature of the conduct.

[18] Article 120b(h)(5)(D), UCMJ.

[19] *Tabor*, ___ M.J. at ___, slip op. at 25.

[20] Lest the issue devolve into a debate over what "immediate vicinity" means, "vicinity" is "1. The state of being near in space or relationship; proximity: *two restaurants in close vicinity*. 2. A nearby, surrounding or adjoining region; a neighborhood." *The American Heritage Dictionary of the English Language* 1929 (5th ed. 2018). Thus, conduct in one location that is done "in the presence of" another person, miles away, via communication technology is not conduct done "in the immediate vicinity of" the other person. If it were, then "in the immediate vicinity of" would be derived from sensory awareness, not spatial location, which is precisely what *Schmidt I* held "in the presence of" means under Article 120b(c).

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

> "The deployed Sailor showed off his new tattoo via FaceTime *in the presence of* his girlfriend and her parents."

> "Due to security concerns, the mob informer testified *in the presence* of the jury via closed circuit television."

> "During the pandemic, the counsel delivered oral arguments *in the presence of* the appellate court via teleconference."

Thus, when "including via any communication technology" is added, the phrase, conduct done "in the presence of" a child, cannot be read to connote mere physical location or proximity. In context, the phrase can only be read as requiring the sort of transfer of sensory information that can occur via *communication* technology.

The above examples of "in the presence of" from *Black's Law Dictionary* demonstrate why this is so. All of them have the same ordinary meaning (connoting sensory awareness by the person of the conduct done "in their presence") when the modifier, "including via any communication technology," is added. An agent could certainly do an act in the presence of the principal via communication technology—e.g., enter into a contract on the principal's behalf while the principal looks on via FaceTime—which makes the principal aware of the conduct. Proceedings could occur in the presence of a defendant via video-teleconference, which enables him to see and hear what is going on. A counsel could commit a contemptuous action in the presence of the court—i.e., within view of the judge or other person in court—while participating in a proceeding via Teams. And a witness could sign a will in the presence of a testator via FaceTime, since the use of that communication technology would allow the testator to be aware (through sight or other sense) of that action. In every case, we would say that the conduct is done "in the presence of" another person *via communication technology* because that technology, through the transfer of sensory data, enables the other person to observe the conduct.

On the other hand, what doesn't make sense when the modifier, "including via any communication technology," is added is the view that conduct done "in the presence of" another person simply means that the conduct was done "in the immediate vicinity of" the person. Consider, for example:

> "President Roosevelt talked about the war effort by radio during his fireside chat *in the presence of* the American people."

That sentence does not connote or imply that the President made his remarks in the immediate vicinity of millions of people, or that he did so without a functioning microphone or at 0400 when everyone was asleep or had their radios turned off. Rather, it conveys through ordinary language exactly what the def-

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

initional examples in *Black's Law Dictionary* demonstrate: that certain conduct (talking) was done "in the presence of" other persons (the American people) by transferring sensory information (sound) via communication technology (radio transmission) to those persons, who were listening to their radios and thus had sensory awareness of what he was saying. If the President were unsuccessful in transferring the sound of his words to the American people, due to equipment malfunction for example, the most one could say is that he *attempted* to talk about the war effort in their presence, but his microphone didn't work, so no one was aware of what he was saying.

The same is true for the phrase used in Article 120b(c), "indecent conduct, intentionally done . . . in the presence of a child, including via any communication technology." In *United States v. Miller*, the case in response to which Congress enacted this very language, the accused in one location switched on his webcam so that a "child" in another location, whose webcam was not on, could see him masturbating.[21] *Irrespective of the accused's inability to see the child*, ordinary language would describe his conduct as being intentionally done "in the presence of" the child via communication technology, since the sensory data of the conduct he did in front of his webcam was transferred to a computer screen that the child was watching (which is exactly what the accused intended). By contrast, if the accused had been unsuccessful in transferring this visual data because his webcam was not switched on or functioning, the most one could say is that he *attempted* to masturbate in the child's presence, but his webcam didn't work, so the child was unaware of what he was doing.

Thus, the only way to conclude that "in the presence of" means "in the immediate vicinity of" is to disregard the modifying phrase, "including via any communication technology," in its entirety. But that approach by the majority, far from making the statutory context "key,"[22] as it should be, instead flatly ignores it. As a result, insofar as the majority claims the statutory language is plain, any lack of ambiguity favors interpreting "in the presence of" to require sensory awareness, not mere physical proximity.[23]

---

[21] *United States v. Miller*, 67 M.J. 87, 88 (C.A.A.F. 2008). While the "child" in *Miller* was actually an undercover policeman, we will assume the child was an actual child for purposes of our analysis here.

[22] *Tabor*, ___ M.J. at ___, slip op. at 24.

[23] *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

## C. Broader Statutory Context

Assuming the statutory language is susceptible to more than one interpretation, "there are a number of factors that provide a framework for engaging in statutory interpretation . . . includ[ing] the contemporaneous history of the statute; the contemporaneous interpretation of the statute; and subsequent legislative action or inaction regarding the statute."[24] These factors all support interpreting "in the presence of" as requiring sensory awareness, consistent with the broader statutory context of sexual abuse of a child under Article 120b(c), which criminalizes indecent conduct as a species of "lewd act" committed "upon a child."[25]

### 1. Historical Context of "in the Presence of"

At the time *Miller* was decided, Congress had imposed the requirement of "physical" presence when it relocated indecent liberty with a child from Article 134 to Article 120(j), UCMJ (2006), defining the offense as "engag[ing] in indecent liberty *in the physical presence of* a child—(1) with the intent to arouse, appeal to, or gratify the sexual desire of any person; or (2) with the intent to abuse, humiliate, or degrade any person."[26] In response to *Miller*'s holding that indecent liberty with a child required physical presence, Congress amended the statutory language to its current form in Article 120b, UCMJ. It did so by incorporating the definition of indecent conduct into the definition of "lewd

---

produces a substantive effect that is compatible with the rest of the law.") (citations omitted).

[24] *United States v. Tardif*, 57 M.J. 219, 226 (C.A.A.F. 2002) (Crawford, C.J., dissenting); *see also Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (explaining that the Court interprets statutory provisions—including delegations—by reading the text "in 'context' and in light of the statutory 'purpose'") (quoting *National Broadcasting Co. v. United States*, 319 U. S. 190, 214 (1943)); *Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *United Steelworkers v. Weber*, 443 U.S. 193, 201 (1979) (examining the legislative history and historical context in which Title VII of the Civil Rights Act of 1964 arose when determining an issue of statutory interpretation involving the act.).

[25] Article 120b(c), UCMJ.

[26] *See* National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 552, 119 Stat. 3257, 3258 (2006) (codified as 10 U.S.C. § 120(j) (2006)) (repealed 2011).

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

act," adding the phrase, "including via any communication technology," and then specifically *deleting* the word "physical" from "in the presence of."[27]

These changes clarify that indecent conduct done "in the presence of" a child under Article 120b(c) does not mean that the conduct must be done in the child's immediate vicinity. Quite the opposite, the changes were specifically designed to remove the requirement of *physical* proximity altogether, in favor of a more generalized sort of presence that can be accomplished "via any communication technology"—i.e., the sort of sensory-information transfer that makes the child aware of the conduct, no matter where on earth it actually occurs. To put it simply, the majority's use of "immediate vicinity" as a surrogate for the old "physical" presence requirement is precisely the interpretation of "in the presence of" that Congress' post-*Miller* amendments were enacted to avoid.[28]

The majority mistakenly points to a decision by the Court of Appeals for the District of Columbia, *Beausoliel v. United States*,[29] in support of its view that awareness is not required for indecent conduct to be done "in the presence of" a child. In *Beausoliel*, a taxi driver driving his cab with a six-year-old girl in the front seat exposed his private parts to the child and requested that she hold the same, which she did. The defendant was convicted of assault, which at common law generally required lack of consent for "improper liberties with the person of a female."[30] However, the court affirmed the conviction, finding that with respect to children,

> where persons take advantage of their ignorance and inexperience for the purpose of violating, outraging, or indecently interfering with their persons, and no actual assent is given to the act, an offense against it is committed.

---

[27] *See* National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 541, 125 Stat. 1407, 1409 (2011) (codified as 10 U.S.C. § 120b(h)(5)(D) (Supp. V 2012)).

[28] If, as the majority maintains, "in the presence of" under Article 120b(c) simply means that one person is "in the immediate vicinity of" the other, then the appellant's conduct in *Miller* once again falls outside the reach of the statute, since his conduct in front of his webcam was not done in the "immediate vicinity" of the "child" who viewed it on a distant computer screen.

[29] 71 App. D.C. 111, 107 F.2d 292 (1939).

[30] *Id.* at 296.

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

> In a case such as the present, threat or danger of physical suffering or injury in the ordinary sense is not necessary. The injury suffered by the innocent victim may be the *fear, shame, humiliation, and mental anguish caused by the assault.* Neither is it necessary that such a victim should be *aware of the nature of the act or of the danger*.[31]

Thus, the type of "awareness" discussed in this passage is *cognitive understanding* of the indecent or dangerous nature of the act, not *sensory awareness* of the act itself, which the child in *Beausoliel* clearly possessed. Such was also the case in *United States v. Brown*, in which our superior court drew from the reasoning in *Beausoleil* to conclude that the elements of indecent liberties with a child were met when the appellant approached two young children aged 10 and 7, "drew abreast of them and, rising up in the seat of his automobile . . . exposed" his private parts to them.[32] Moreover, the *Beausoleil* court's emphasis on "the fear, shame, humiliation, and mental anguish caused by the assault"—which is derived from sensory awareness of the act—is ultimately what *Brown* used as the mechanism for holding that even non-assaultive conduct could constitute indecent conduct done "in the presence of" a child.[33]

Indeed, Congress' changes to this statutory language in the wake of *Miller* serve to realign Article 120b(c) with the view announced in *Brown* that the "purpose of this type of legislation is to protect children under a certain age from those acts which have a tendency to corrupt their morals."[34] Irrespective of where it actually occurs or whether the child completely understands its nature, indecent conduct that is intentionally done under circumstances in which a child will have sensory awareness of it (whether in person or via communication technology) has a tendency to cause the sort of harm—shame, embarrassment, humiliation, corruption of morals—that the offense was historically viewed as proscribing. Conversely, such conduct done under circumstances in which a child is unaware of it does not have a tendency to

---

[31] *Id.* at 296–97 (emphasis added).

[32] *United States v. Brown*, 3 C.M.A. 454, 455, 13 C.M.R. 10, 11 (1953).

[33] *Id.* at 17 (finding the offense of indecent liberties with a child was designed to "throw a cloak of protection around minors and to discourage sexual deviates from performing with, or before, them" by "provid[ing] substantial punishment for those who perform indecent and immoral acts which cause shame, embarrassment, and humiliation to children, or lead them further down the road to delinquency").

[34] *Id.* at 13.

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

cause such harm. Thus, as our superior court held in *United States v. Knowles*, the focus of the phrase, "in the presence of," is on the "conjunction of the several senses" between the accused and the child, not the mere physical proximity between them.[35]

Contrary to the majority's view that the Court overlooked this issue in *Schmidt I*, it is precisely what the holding in *Schmidt I* was premised on: not that cognitive understanding of the nature of the act is required for indecent conduct to be done "in the presence of" a child, but that there be "a sufficient *sensory* connection for the child to be aware of it."[36] This understanding of "awareness" avoids the "strange" results posited by the majority. In *Miller*, for example, the appellant was intentionally committing sexual conduct with his webcam switched on so that the "child" to whom he was communicating would see it via that communication technology. Since observing such conduct is what tends to cause the sort of corrupting harm that the statute is designed to prevent, the appellant's intentional act of doing the conduct "in the presence of" the "child" via communication technology now falls within the statutory language (which was amended in response to *Miller* to cover exactly this type of situation). On the other hand, where a child lacks any sensory awareness of the conduct because the child is either asleep or otherwise unaware that it is occurring—e.g., watching a movie in a theater while the conduct is taking

---

[35] *United States v. Knowles*, 15 C.M.A. 404, 405–406, 35 C.M.R. 376, 377–78 (1965). Contrary to the majority's view, the court in *Knowles* would not have specifically held open the issue of whether an indecent act could be performed "in the presence" of a child via an audio-visual system if it did not conceive of that phrase as requiring sensory awareness, as opposed to physical proximity, of the conduct.

[36] *Schmidt I*, 80 M.J. at 598 (emphasis added).

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

place, unobserved, in some other row—the conduct may still constitute "indecent conduct" under Article 134 due to its open and notorious nature,[37] but it would not constitute "sexual abuse of a child" under Article 120b(c).[38]

In addition to reverting to a physical presence requirement that Congress intentionally eliminated, the majority compounds the error by blurring the distinction between conduct being "indecent" and such conduct being "intentionally done . . . in the presence of a child." Contrary to the statutory language, which requires both, the majority's conflated interpretation suggests that any sexual conduct done in the immediate vicinity of a child (irrespective of whether the child is intended to, or in fact does, have any awareness of it) would, in and of itself, be "indecent." This would mean that parents who discreetly have intercourse in the same room as their sleeping infant could be subject to criminal prosecution for sexual abuse of a child. Congress *could* draw this kind of broad statutory prohibition if it so chose, and it knows how to accomplish that through clear, specific language.[39] But that is not the kind of prohibition Congress *did* draw with the language it chose to enact in Article 120b.

---

[37] *See Sims*, 57 M.J. at 421 (holding that otherwise lawful sexual conduct may be indecent if it is "open and notorious," meaning intentionally committed "in such a place and under such circumstances that that it is reasonably likely to be seen by others even though others do not actually view the acts") (quoting *Izquierdo*, 51 M.J. at 423); *United States v. Burkhart*, 72 M.J. 590, 596 (A.F. Ct. Crim. App. 2013) (finding the appellant's masturbation while sitting on a couch a few feet away from his sleeping three-year-old, with his attention focused on watching some type of activity on his computer, while not an indecent liberty "in the presence of a child," was still indecent conduct under Article 134 because under the circumstances "it was reasonably likely his daughter could awaken and see his activity").

[38] The majority suggests it would be absurd for Article 120b(c) not to apply to sleeping or unaware children because they are more vulnerable to abuse. But our superior court in *Brown* quite reasonably reached the opposite conclusion with respect to such non-contact offenses, that what makes certain indecent conduct more punishable is its tendency to cause the sort of harm to a child that depends on their awareness of it. *See Brown*, 3 C.M.A. at 461, 13 C.M.R. at 17 ("The remedy for the evil, if any, is to provide substantial punishment for those who perform indecent and immoral acts which cause shame, embarrassment, and humiliation to children, or lead them further down the road to delinquency.").

[39] *See, e.g.*, Article 120(b), 120(d), UCMJ (prohibiting penetrative sexual acts and contact "when the person knows or reasonably should know that the other person is asleep, unconscious, or otherwise unaware that the sexual act [or contact] is occurring").

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

### 2. Use of "in the Presence of" Elsewhere in the UCMJ

Finally, interpreting indecent conduct done "in the presence of" of a child as requiring sensory awareness of the conduct by the child is also in keeping with how that phrase is generally used and construed in other punitive articles and definitions in the UCMJ.

For the offense of escape from custody under Article 87a, UCMJ, the *Manual for Courts-Martial* [*MCM*] explains that "[c]ustody may consist of control exercised *in the presence of* the prisoner by official acts or orders."[40] Courts have interpreted "in the presence of" in this context variously as "the condition of being within sight or call" and the "space within one's ken, call, or influence."[41] Upon reviewing these case precedents, this Court held that "[w]hile a common thread to these cases is difficult to find, the thread seems to be that when the detainee reasonably knows that he remains subject to the custodian's influence or control, he is in custody."[42] In other words, for such control to be exercised "in the presence of" the prisoner, the prisoner must at the very least have received enough sensory information to be aware of it.

With respect to contempt toward officials under Article 88, UMCJ, the *MCM* explains that "the utterance of contemptuous words . . . *in the presence of* military subordinates, aggravates the offense," but "expressions of opinion made in a purely private conversation should not ordinarily be charged."[43] Similarly, for disrespect toward a superior commissioned officer under Article 89, UCMJ, the *MCM* states that "[d]isrespect by acts includes neglecting the customary salute, or showing a marked disdain, indifference, insolence, impertinence, undue familiarity, or other rudeness *in the presence of* the superior officer," and "[i]t is not essential that the disrespectful behavior be *in the presence of* the superior, but ordinarily one should not be held accountable under this article for what was said or done in a purely private conversation."[44] Thus, what both of these offenses contemplate is that for the offending conduct to be done "in their presence," the military subordinates or superiors must observe

---

[40] *MCM*, pt. IV, ¶ 12.c.(4)(a) (emphasis added).

[41] *United States v. Borges*, 41 M.J. 739, 743–44 (N-M. Ct. Crim. App. 1994) (collecting cases).

[42] *Id. at* 745.

[43] *MCM* (2019), pt. IV, para. 14.c (emphasis added).

[44] *MCM* (2019), pt. IV, para. 15.c.(2)(b)–(c) (emphasis added).

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

it (since contemptuous or disrespectful remarks made in a purely private conversation are not generally punishable).

Article 94, UMCJ, makes it criminal for a person subject to the UCMJ to "fail[ ] to do his utmost to prevent and suppress a mutiny or sedition being committed *in his presence . . . .*"[45] The use of the phrase, "in his presence," here clearly contemplates not merely that the mutiny or sedition occur in the person's immediate vicinity, but that the person be aware of it. As Winthrop tells us, "the Article makes it a crime to simply 'stand by' while a mutiny is being committed,"[46] which itself implies awareness. Construing the language otherwise—as imposing criminal liability for failing to prevent and suppress a mutiny or sedition, however close at hand, that the person is simply unaware is occurring—would be absurd.[47]

Robbery is defined under Article 122, UCMJ, as "tak[ing] anything of value from the person or *in the presence of* another, against his will, by means of force or violence or fear of immediate or future injury to his person or property . . . ."[48] With respect to whether a taking is "in the presence of" the victim, the *MCM* explains that "[i]t is not necessary that the property taken be located within any certain distance of the victim," but that a robbery occurs where the victim is forced "by threats to disclose the hiding place of valuables in an adjoining room," from which they are stolen.[49] In addition, "[t]he offense is not robbery if . . . a pocket is picked by stealth, no other force is used, and the owner is not put in fear."[50] In this context, the taking of valuables "in the presence of" the victim does not depend on the mere physical location or proximity of the taking to the victim, but rather on the use of assaultive conduct—i.e., force, violence, or threat—to effect the taking, through which the victim gains sensory awareness that it is occurring.

---

[45] Article 94(a)(3), UCMJ (emphasis added).

[46] William Winthrop, *Military Law and Precedents*, 585 (Gov't Print. Off. 1920) (2d ed. 1895) [Winthrop].

[47] *See United States v. Custis*, 65 M.J. 366, 370 (C.A.A.F. 2007) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000)).

[48] Article 122, UCMJ (emphasis added).

[49] *MCM* (2019), pt. IV, para. 67.c.(1).

[50] *MCM* (2019), pt. IV, para. 67.c.(2).

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

Similarly, the offense of stalking under Article 130, UCMJ, prohibits, among other things, "a repeated conveyance of verbal threats, written threats, or threats implied by conduct . . . directed at or toward a specific person"[51] that "would cause a reasonable person to fear death or bodily harm . . . ."[52] The *MCM* explains that such a threat "may be made directly to or *in the presence of* the person it is directed at or towards . . . ."[53] Thus, for such threatening conduct to be done "in the presence" of the victim, the crucial factor is not its mere physical location or proximity to the victim, but the fact that the victim is aware of it (otherwise, it could not cause reasonable fear of death or bodily harm).[54]

Article 131d, UCMJ, makes it punishable for a person subject to the UCMJ to, "*in the presence of* a court-martial, a board of officers, a military commission, a court of inquiry, preliminary hearing, or an officer taking a deposition . . . wrongfully refuse[ ] to qualify as a witness or to answer a question after having been directed to do so by the person presiding."[55] Use of "in the presence of" in this context plainly contemplates that the conduct (e.g., refusing to testify) occur within the sensory awareness (i.e., sight/hearing) of the person presiding over the proceeding, which is the context in which courts have addressed the issue.[56]

Essentially the only punitive article discussing conduct done "in the presence of" another person in which that phrase does *not* connote that the other person has sensory awareness of the conduct is the offense of "misconduct before or *in the presence of* the enemy" under Article 99, UCMJ. But even for this offense, "before or in the presence of" the enemy does not mean "in the immediate vicinity of" the enemy. As the *MCM* explains,

---

[51] Article 130(b)(2)(B), UCMJ.

[52] Article 130(a)(1), UCMJ.

[53] *MCM* (2019), pt. IV, para. 80.c.(2) (emphasis added).

[54] *See United States v. Gutierrez*, 73 M.J. 172, 176 (C.A.A.F. 2014) (holding that the appellant's ringing of the victim's doorbell for an hour at 0200 after she refused to let him in her apartment was threatening conduct that amounted to stalking under the statute, since it could cause the victim reasonable fear of bodily harm).

[55] Article 131d, UCMJ (emphasis added).

[56] *See, e.g., United States v. Kirsch*, 15 C.M.A. 84, 87, 35 C.M.R. 56, 59 (1964) (witness refused to answer certain questions during testimony at court-martial); *United States v. Quarles*, 50 C.M.R. 514, 518 (N.C.M.R. 1975) (same).

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

> [w]hether a person is before or in the presence of the enemy is a
> question of tactical relation, *not distance*. For example, a mem-
> ber of an antiaircraft gun crew charged with opposing antici-
> pated attack from the air, or a member of a unit about to move
> into combat may be before the enemy although miles from the
> enemy lines. On the other hand, an organization some distance
> from the front or immediate area of combat which is not a part
> of a tactical operation then going on or in immediate prospect is
> not "before or in the presence of the enemy" within the meaning
> of this article.[57]

Thus, similar to the way the phrase is used elsewhere in the *MCM*, the focus
of conduct done "before or in the presence of" the enemy is not on physical lo-
cation or proximity, but on the *relationship* between the conduct and the other
person or entity. The difference is that for Article 99 the focus is on whether
there is a tactical relationship, as opposed to a sensory one.

As Winthrop tells us, this difference was intentional. Historically, the of-
fense of misconduct before the enemy was intended to reach a wide range of
combat-related misconduct well prior to actual engagement, such as a com-
manding officer "abandoning, or absenting himself from, his post when expect-
ing an enemy attack," or an officer or soldier "going to the rear or leaving the
command when engaged with the enemy, or expecting to be engaged . . . ."[58]
For this reason, the offense did not require the misconduct to be done within
sight of the enemy:

> If he is confronting the army or in its neighborhood, though sep-
> arated from it by a considerable distance, and the service upon
> which the party is engaged, or which he is especially ordered or
> properly required by his military obligation to perform, be one
> directed against the enemy, or resorted to in view of his move-
> ments, the misbehavior committed will be "before the enemy" in
> the sense of the Article.[59]

Because of this historical difference, the use of the phrase in the offense of
misconduct "before or in the presence of" the enemy has a different meaning

---

[57] *MCM* (2019), pt. IV, para. 27.c.(1)(c) (emphasis added); *see also United States v.
Sperland*, 1 C.M.A. 661, 663, 5 C.M.R. 89, 91 (1952) (discussing meaning of "before or
in the presence of the enemy.").

[58] Winthrop at 622–23.

[59] *Id.* at 623.

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

from the way "in the presence of" is used in other offenses under the UCMJ, including sexual abuse of a child under Article 120b. Nevertheless, even under Article 99, as in all the other offenses discussed above, the requirement that certain conduct be done "in the presence of" a person or entity does *not* connote mere physical location or proximity of the person or entity to the conduct.

**D. Appellant's Plea was Provident under *Schmidt I***

In this context, we review the military judge's decision to accept Appellant's guilty plea to sexual abuse of a child under Article 120b(c), which we review for an abuse of discretion.[60] "A military judge abuses this discretion if he fails to obtain from the accused an adequate factual basis to support the plea—an area in which we afford significant deference."[61] A guilty plea will not be set aside on appeal unless there is "a substantial basis in law and fact for questioning [it]."[62]

"[I]n guilty-plea cases the quantum of proof is less than that required at a contested trial."[63] A providence inquiry into a guilty plea must establish that the accused believes and admits he is guilty of the offense, and the factual circumstances admitted by the accused must objectively support the guilty plea.[64] When the accused's responses reasonably raise the question of a defense, the military judge must make a more searching inquiry.[65] However, the military judge is not required "to embark on a mindless fishing expedition to ferret out or negate all possible defenses or inconsistencies."[66]

The military judge followed these rules to the letter before accepting Appellant's guilty plea. He advised Appellant about the pertinent elements and definitions relating to the charged offense of sexual abuse of a child. He then admitted and considered the stipulation of fact, in which Appellant stated

---

[60] *See United States v. Simmons*, 63 M.J. 89, 92 (C.A.A.F. 2006).

[61] *United States v. Caldwell*, 72 M.J. 137, 144 (C.A.A.F. 2013) (quoting *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)).

[62] *United States v. Phillippe*, 63 M.J. 307, 309 (C.A.A.F. 2006).

[63] *United States v. Pinero*, 60 M.J. 31, 33 (C.A.A.F. 2004).

[64] *United States v. Garcia,* 44 M.J. 496, 497–98 (C.A.A.F. 1996).

[65] *United States v. Timmins*, 45 C.M.R. 249, 253 (C.M.A. 1972).

[66] *United States v. Jackson,* 23 M.J. 650, 652 (N.M.C.M.R. 1986), *pet. denied,* 24 M.J. 405 (C.M.A. 1987).

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

among other things that (1) when Ms. Charles texted him that she was going to masturbate in bed next to Miss Bravo when she fell asleep, he directed Ms. Charles to "[d]o it anyway"; (2) he then encouraged Ms. Charles to masturbate by saying, "[e]ven if she's awake do it . . . Hotter if she is"; and (3) he received digital images from Ms. Charles showing her removing her clothes and underwear and stimulating herself on the bed where she had stated Miss Bravo was lying next to her.[67]

During the providence inquiry, Appellant stated he sent these messages to Ms. Charles because he intended for her to masturbate in the bed next to Miss Bravo before Miss Bravo fell asleep.[68] Appellant then stated that based on the photos he received from Ms. Charles he had the impression that Miss Bravo was asleep, but that he was not in the room at the time to confirm whether she was or not. At that point, the military judge, noting the issue of whether Miss Bravo was "completely unaware" of the charged misconduct, informed the parties that "if [Appellant's] belief is that the kid was asleep, I think we've got a problem with this guilty plea."[69] He then told Appellant, "If you don't believe you're guilty, then you should not plead guilty for any reason,"[70] before placing the court in recess for 25 minutes.

After the recess, the military judge asked Appellant specific, tailored questions that thoroughly addressed the issue of whether Miss Bravo was asleep and thus unaware of the charged misconduct:

> MJ: . . . So , Staff Sergeant Tabor , we were discussing your guilty plea to Specification 2 of Charge I, sexual abuse of a child, and there was some confusion as to whether or not you believed that [Miss Bravo] was awake when her mother was masturbating, as you had counseled her to do or encouraged her to do; is that correct?
>
> ACC: Sir, after the talking—reviewing the evidence and talking with the counsel, the text messages were, "Was gonna masturbate when she fell asleep but she is still awake." And I said, "Do it anyway." And she said, "She's

---

[67] Pros. Ex. 1 at 2.

[68] R. at 419, 423.

[69] *Id*. at 425–26.

[70] *Id*. at 427.

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

in bed with me." And then I said, "Even if she's awake do it. Hotter if she is."

MJ: Okay. So is it your understanding that she was probably awake then?

ACC: Probably.

MJ: Okay. And you want to plead guilty to this offense, understanding that that is a potential issue here? I mean, your counsel cited the *Lewis*—the *Lopez* case, which indicates that you could commit a lewd act with a sleeping child, although, there is some other case law from other jurisdictions that, potentially, might indicate that is not the case, from older case law? Do you understand that?

ACC: Yes, sir, I do.

MJ: Okay. So based on those text messages, do you believe that at certain parts during this interaction when you were encouraging [Ms. Charles] to masturbate in front of her daughter that she was, in fact, awake?

ACC: Yes, sir. I believed so shortly after she sent me photos of her masturbating.

. . . .

MJ: Okay. How was she masturbating? What exactly was she doing?

ACC: She was touching her vagina, sir.

MJ: Okay.

ACC: She sent a picture of her touching her vagina.

MJ: And her vagina was exposed, there wasn't clothing covering it?

ACC: No, sir.

MJ: And she sent you these images of her touching her exposed vagina via text?

ACC: Yes, sir.

MJ: And this was done by her intentionally?

ACC: Yes, it was, sir.

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

MJ: And this was—as—in conjunction with you counseling her intentionally to do so?

ACC: Yes, sir.

MJ: So you were asking her to do these things?

ACC: Yes, sir.

MJ: Do you agree and admit that this intentional exposure of her vagina and masturbating in front of [Miss Bravo] was with the specific intent to gratify your sexual desire?

ACC: Yes, sir.

. . . .

MJ: And was it also to gratify [Ms. Charles'] sexual desire?

ACC: Yes, sir.

MJ: That is in the context of the text messages that were going back and forth?

ACC: Yes, sir.

MJ: Did this—masturbating in front of her—amount to a form of immorality relating to sexual impurity, which is grossly vulgar, obscene, and repugnant to common propriety and tends to excite the sexual desire or deprave morals with respect to sexual relations?

ACC: Yes, sir.

MJ: How so?

ACC: I understand that this conduct, of [Ms. Charles] masturbating in the presence of [Miss Bravo] amounted to a form of immorality relating to sexual impurity that's gross, vulgar, obscene, or repugnant to common propriety.

MJ: Why? . . . .

ACC: Because of her touching her vagina and masturbating in front of her daughter is gross and vulgar.

MJ: And it excited sexual desires and deprave morals?

ACC: Yes, sir.

. . . .

76

*United States v. Tabor*, NMCCA No. 202100046
GASTON, S.J. (concurring in part, dissenting in part,
and concurring in the judgment)

MJ: Okay. So that case that was cited [*United States v. Lopez*, No. 201700252, 2019 CCA LEXIS 37 (N-M. Ct. Crim. App. Jan. 31, 2019) (unpublished)] was—although it doesn't apply, I mean, it appears that [Appellant] is provident to the fact that [Miss Bravo] was awake during some periods of the masturbation.

MJ: Do both sides concur with that?

TC: Yes, sir.

CDC: Yes, sir.[71]

Appellant's answers to these and other questions during the military judge's providence inquiry support that he encouraged Ms. Charles to openly masturbate on the bed next to Miss Bravo, at a time when he reasonably believed that Miss Bravo was awake and thus had sensory awareness of the conduct occurring next to her, and that Ms. Charles committed the conduct under those circumstances. These factual circumstances admitted by Appellant objectively support his guilt and are not inconsistent with the other evidence presented at trial. Therefore, I would find no substantial basis in law or fact for questioning Appellant's plea to sexual abuse of a child by indecent conduct intentionally done "in the presence of" Miss Bravo, as that phrase was interpreted by this Court in *Schmidt I*.

## II. CONCLUSION

Accordingly, while I do not join the majority's analysis concluding that *Schmidt I* was wrongly decided, I concur with the judgment reached by the Court and with the majority's conclusions with respect to Appellant's second, third, and fourth assignments of error.

Judge STEWART concurs.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[71] *Id.* at 428–33.